**TOYS "R" US, INC., Plaintiff,**

v.

**CANARSIE KIDDIE SHOP, INC., d/b/a Kids "R" Us, and Abe Pomerantz, Defendants.**

No. 82 Civ. 3996.

United States District Court, E.D. New York.

March 17, 1983.

---

Shea & Gould, McAulay, Fields, Fisher, Goldstein & Nissen, New York City, for plaintiff.

Morril & Paul, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GLASSER, District Judge:

This is an action for trademark infringement, unfair competition, and violation of the New York anti-dilution statute, instituted by plaintiff Toys "R" Us, Inc. ("Toys") against defendants Canarsie Kiddie Shop, Inc., d/b/a Kids 'r' Us ("Kids")

and Abe Pomeranc.[1] Toys seeks a permanent injunction restraining defendants from using the mark Kids 'r' Us.

Kids in response has entered a counterclaim, also alleging trademark infringement, unfair competition, and violation of the New York anti-dilution statute. Kids seeks an injunction restraining Toys from carrying out plans to utilize the mark Kids "R" Us in connection with the sale of children's clothing.

Plaintiff made an application, by order to show cause, for a preliminary injunction on December 21, 1982. Defendants cross-moved for a preliminary injunction at that time. This Court, per agreement of the parties, entered an order enjoining and restraining the plaintiff from opening stores or using the Kids "R" Us name and mark, pending trial of this action (which was consolidated with the motions for preliminary injunctions pursuant to Rule 65(a)(2)).

On the basis of the bench trial subsequently held before me, the following represent my findings of fact and conclusions of law. For the reasons that follow, the relief sought by the plaintiff is granted, and the relief sought by the defendants is denied.

### FACTS

The basic facts involved here are largely undisputed, see Stipulated Facts, and are as follows.

*Toys' Business*

Since in or about 1960, Toys (and its predecessors in interest) has been engaged in the commercial promotion and sale of toys throughout the United States. Toys also sells juvenile furniture, lamps, sporting equipment, linens, books, school supplies, electronic games and children's clothing; Toys is the largest retailer of children's disposable diapers in the United States. These goods are carried by each one of Toys' stores including those stores located within the State of New York.

Toys owns and operates approximately 144 retail stores across the United States, including 15 stores located in the State of New York. On November 15, 1975, Toys opened its first store in Brooklyn, New York. That store is located adjacent to the Kings Plaza Shopping Center at Flatbush Avenue and the Belt Parkway. The Flatbush Avenue store has been in continuous operation since it opened.

In late 1982, Toys opened a second store in Brooklyn, New York. That store is located at 6873–95 Bay Parkway.

In addition to the two Brooklyn stores, Toys currently owns and operates seven stores in Nassau and Suffolk Counties, a store in Queens and a store in Staten Island. At least seven of the Toys "R" Us stores in Brooklyn, Long Island and Staten Island were in operation in July 1977.

The apparel sold by Toys is intended for both boys and girls from infancy through the pre-teen years. Toys sells children's clothing, including crib sets, dresses, sleepwear, outerwear, coats, footwear, jackets, hosiery, jeans, sunsuits, sweatsuits, robes, hats, gloves and snowsuits. The prices at which Toys sells its children's clothing range from between less than a dollar to approximately $20.00. Toys does not manufacture any of the children's clothes that it sells; sales of children's clothing are made on a retail basis only.

Toys has present plans to expand its operations by opening stores devoted exclusively to the sale of children's clothing and related items. Toys' present plans are to use the trademark Kids "R" Us in connection with such an expansion. Toys' first two planned children's clothing stores are slated to be located in Brooklyn, New York and Paramus, New Jersey (Transcript p. 141).

Toys has invested time and money in the development of plans to open stores devoted exclusively to the sale of children's clothing.

For the fiscal year ended January 31, 1982, Toys' sales of goods and services un-

---

1. Although the plaintiff in commencing suit spelled the defendant's name as Pomerantz, the correct spelling appears to be Pomeranc.

der its Toys "R" Us trademark and service mark were in excess of $780 million nationally. Of this amount, approximately $20 million represents Toys' 1981 sales of children's clothing.

For the year ended January 31, 1982, Toys' sales of children's clothing in stores located in New York State totaled approximately $1,836,000, of which $178,000 represents sales in Toys' Brooklyn (Flatbush Avenue) store.

For the year ended January 31, 1983, Toys' sales of children's clothing in stores located in New York State have totaled in excess of $3,150,000, of which $244,000 represents sales in Toys' Brooklyn (Flatbush Avenue and Bay Parkway) stores.

Since 1961, Toys, and its predecessors in interest, have continually used the trademark Toys "R" Us to identify and distinguish those items sold and promoted by them throughout the United States, including extensive use in the State of New York. Toys is the owner of United States Trademark Registration No. 902,125 for the trademark Toys "R" Us. Plaintiff has filed affidavits pursuant to the Lanham Trademark Act, 15 U.S.C. §§ 1065, 1115(b). Toys is the owner of United States Service Mark Registration No. 1,215,353 for the service mark Toys "R" Us for use in connection with retail department store services. Toys is also the owner of United States Trademark Registration No. 1,207,355 for the trademark TOGS "R" US for hosiery. Toys used phrases such as SKATES "R" US, BIKES "R" US, GAMES "R" US and similar phrases in its advertising.

Since 1975, Toys has spent in excess of $75 million to advertise, publicize and promote the sale of products and services at Toys "R" Us stores throughout the United States. The $75 million spent by Toys on advertising since 1975 has been used to advertise, publicize and promote on television and radio, and in various print media, the sale of products and services at Toys "R" Us stores.

Since 1975, Toys has spent in excess of $8.5 million in the State of New York to advertise, publicize and promote, on television and radio, and in various print media, its sales and its Toys "R" Us stores. Toys advertising in the New York metropolitan area includes regular advertising in local newspapers. Toys has advertised in the New York metropolitan area since late 1975, and in that time has spent in excess of $2 million in television advertising in the New York area.

*Kids' Business*

Since 1962, defendant Pomeranc or his parents have operated children's clothing stores in Brooklyn, New York. The first store—which was only 500 square feet—was called Canarsie Kiddie Shop and was located at 1441 Rockaway Parkway in Brooklyn.

In 1973, Pomeranc entered the business, and in September 1977, he opened a store at 9419 Avenue L in Brooklyn. At or about the time the Avenue L store was opened, Pomeranc decided to adopt the name, "Kids 'r' Us." Before using the "Kids 'r' Us" name, Pomeranc and his attorney cleared the name for adoption as defendant's corporate name with the Secretary of State of New York, filing a certificate of incorporation as Kids 'r' Us, Inc. on August 12, 1977. The Certificate of Incorporation for Kids 'r' Us, Inc. was amended on or about April 20, 1979 to change the name of the corporation to Canarsie Kiddie Shop, Inc.

Defendants' Avenue L store was called Kids 'r' Us and, after the corporate name change, Canarsie Kiddie Shop, Inc. registered its use of the assumed name Kids 'r' Us pursuant to Section 130 of the New York General Business Law on May 16, 1979.

Defendants opened a second Kids 'r' Us store in August 1978. This store expanded to include the adjacent storefront in February 1979 when defendants closed their other stores and consolidated all of their retailing operations into their present 3,000 square foot Kids 'r' Us store at 1445–47 Rockaway Parkway in Canarsie.

Defendants, like Toys, sell apparel intended for both boys and girls, from infancy through the pre-teen years.

The Canarsie Kiddie Shop, Inc.'s Certificate of Incorporation dated August 8, 1977 and Certificate of Amendment of the Certificate of Incorporation dated March 13, 1979 state that the purpose of the corporation is to "carry on and conduct the business of buying, selling and dealing generally in children's and adult clothing, toys, jewelry and furnishings at retail and wholesale."

Defendants do not manufacture any of the goods that are sold in the Kids 'r' Us store and such sales are made on a retail basis only. The locations at which defendants have operated stores are within an approximately two mile radius of Toys' Flatbush Avenue (Kings Plaza) store. Defendants are considering the possible expansion of their business to locations outside of the Canarsie section of Brooklyn. One of the locations the defendants had considered expanding into was located approximately three blocks away from the Toys' Bay Parkway store (Transcript pp. 554–5). No written agreements have been entered into by defendants for any expansion plans (Transcript pp. 599–601).

At no time during its existence have defendants' gross sales from its children's clothing business exceeded $250,000 annually. Defendants have never advertised on television or radio. Defendants have placed a limited number of advertisements in local Brooklyn newspapers. The total amount of money spent by defendants on advertising and other promotions has not exceeded $2,500 in any year in which defendants have operated under the name Kids 'r' Us. Indeed, defendants' tax returns for the years 1978–81 reflect that during that period the defendants never spent in excess of $536 on advertising in any one year (Transcript p. 573).

The name Kids 'r' Us has not been registered by defendants as a trademark, tradename or service mark with any governmental authority. On or about January 5, 1981, Canarsie Kiddie Shop, Inc. obtained a New York State Registration, No. S–5975, for a service mark consisting of a "Shooting Star in Colors."

*Likelihood of Confusion*

Toys asserts three grounds for the relief requested: trademark infringement, false designation of origin, and violation of the New York State anti-dilution statute. The first two of these claims will be discussed together.

In order to prevail on its claim for trademark infringement under 15 U.S.C. § 1114(1)(a), or for false designation of origin under 15 U.S.C. § 1125(a), the plaintiff must establish that the defendants' use of the mark Kids 'r' Us creates a "likelihood of confusion." *See Lambda Electronics v. Lambda Technology, Inc.,* 515 F.Supp. 915, 924 (S.D.N.Y.1981); *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 414 (S.D.N.Y.1974). The pivotal inquiry is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In determining whether there is a likelihood of confusion the Court must "balance the equities," weighing the interests of the senior user, the junior user, and the public consumer. *Lambda Electronics v. Lambda Technology, Inc., supra,* 515 F.Supp. at 924.

In assessing the likelihood of confusion and in balancing the equities, this Court must consider the now classic factors discussed in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These are:

(1) the strength of the senior user's mark;

(2) the degree of similarity between the two marks;

(3) the proximity of the products;

(4) the likelihood that the senior user will bridge the gap;

(5) actual confusion;

(6) the junior user's good faith;

(7) the quality of the junior user's product; and

(8) the sophistication of the buyers.

Although the *Polaroid* standards were enunciated in the context of noncompeting goods, *Polaroid* was recently expressly extended to apply to cases that do involve competing goods. *Vittarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 967 (2d Cir.1981).

1. *Strength of the Senior User's Mark*

■ The Second Circuit has stated that "[t]he term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify goods sold under the mark as emanating from the particular, although possibly anonymous, source." *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). A mark can fall into one of four general categories which, in order of ascending strength, are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id.* The strength of a mark is generally dependent both on its place upon the scale and on whether it has acquired secondary meaning. *Lambda Electronics v. Lambda Technology Inc., supra,* 515 F.Supp. at 925.

■ A generic term "refers, or has come to be understood as referring to the genus of which the particular product is a species." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir. 1976). *See, e.g., Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.,* 343 F.2d 655 (7th Cir.1965) ("Yo-Yo"). A generic term is entitled to no trademark protection whatsoever, since any manufacturer or seller has the right to call a product by its name. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 9.

■ A descriptive mark identifies a significant characteristic of the product, but is not the common name of the product. *Id.* at 10. A mark is descriptive if it "informs the purchasing public of the characteristics, quality, functions, uses, ingredients, components, or other properties of a product, or conveys comparable information about a service." 1 J. Gilson, *Trademark Protection and Practice,* § 2.03, at pp. 2–31 (1982). *See, e.g., Exquisite Form Industries v. Exquisite Fabrics of London,* 378 F.Supp. 403 (S.D.N.Y.1974) ("Exquisite" for wearing apparel). To achieve trademark protection a descriptive term must have attained secondary meaning, that is, it must have "become distinctive of the applicant's goods in commerce." *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979), *quoting* 15 U.S.C. § 1052(f).

■ A suggestive mark is one that "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 11, *quoting Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968). These marks fall short of directly describing the qualities or functions of a particular product or service, but merely suggest such qualities. 1 J. Gilson, *Trademark Protection and Practice,* § 2.04, at pp. 2–39 (1982). *See, e.g., Dietene Co. v. Dietrim Co.,* 225 F.2d 239 (8th Cir.1955) ("Dietene" for a dietary food supplement). If a term is suggestive, it is entitled to protection without proof of secondary meaning. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 11.

■ Arbitrary or fanciful marks require no extended definition. They are marks which in no way describe or suggest the qualities of the product. *See, e.g., Exxon Corp. v. Xoil Energy Resources Inc.,* 552 F.Supp. 1008 (S.D.N.Y.1981) ("Exxon").

The Toys "R" Us mark is difficult to categorize. The plaintiff argues that the mark is at least suggestive, combining a descriptive word, Toys, with a suggestive or arbitrary phrase, "R Us." The defendants argue that the mark is merely descriptive, being quite literally a description of the plaintiff's business, i.e., "we sell toys."

■ The strength of the plaintiff's mark must be evaluated by examining the mark in its entirety, rather than breaking down its component parts. *See Armstrong*

*Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir.1979), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979); *Industrial Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 1199 (Cust. & Pat.App.1973). I agree that the Toys "R" Us mark serves to describe the business of the plaintiff, and in this sense is merely descriptive. This descriptive quality, however, does require some "imagination, thought, and perception" on the part of the consumer since the plaintiff's mark, read quite literally, conveys the message, "we are toys," rather than "we sell toys."

Whether the "leap of imagination" required here is sufficient to render the mark suggestive rather than descriptive is a question with no clear-cut answer. Such an absolute categorization is not essential, however, since the defendants concede that through the plaintiff's marketing and advertising efforts the Toys "R" Us mark has acquired secondary meaning in the minds of the public, at least in relation to its sale of toys. Such secondary meaning assures that the plaintiff's mark is entitled to protection even if it is viewed as merely descriptive. Because I find that through the plaintiff's advertising and marketing efforts the plaintiff's mark has developed strong secondary meaning as a source of children's products, it is sufficient for purposes of this decision to note merely that the plaintiff's mark is one of medium strength, clearly entitled to protection, but falling short of the protection afforded an arbitrary or fanciful mark. *See, e.g., Narwood Productions, Inc. v. Lexington Broadcast Services Co., Inc.*, 541 F.Supp. 1243, 1248 (S.D.N.Y.1982).[2]

2. *Degree of Similarity Between the Two Marks*

In considering the degree of similarity between two marks, the key inquiry is not similarity *per se*, but rather whether a similarity exists which is likely to cause confusion. *See Exxon Corp. v. Xoil Energy Resources, Inc.*, 552 F.Supp. 1008, 1016 (S.D.N.Y.1981). This test must be ap-

plied from the perspective of prospective purchasers. *Id.* Thus, it must be determined whether "the *impression* which the infringing [mark] makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trade-mark." *McGregor-Doniger, Inc. v. Drizzle, Inc., supra*, 599 F.2d at 1133. In making this determination, it is the overall impression of the mark as a whole that must be considered. *See, Armstrong Cork Co. v. World Carpets, Inc., supra; Industrial Nucleonics Corp. v. Hinde, supra.*

Turning to the two marks involved here, various similarities and differences are readily apparent. The patent similarity between the marks is that they both employ the phrase, "R Us." Further, both marks employ the letter "R" in place of the word "are," although the plaintiff's mark uses an inverted capitalized "R," while the defendants generally use a non-inverted lower case "r" for their mark.

The most glaring difference between the marks is that in one the phrase "R Us" is preceded by the word "Toys," while in the other it is preceded by the word "Kids." Other differences include the following: plaintiff's mark ends with an exclamation point, plaintiff frequently utilizes the image of a giraffe alongside its mark, plaintiff's mark is set forth in stylized lettering, usually multi-colored, and plaintiff frequently utilizes the words, "a children's bargain basement" under the logo in its advertising.

I attach no great significance to the minor lettering differences between the marks, or to the images or slogans usually accompanying the plaintiff's mark. Such minor differences are unlikely to be noticed by many consumers, and are undetectable when the two marks are spoken. *See Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons*, 523 F.2d 1331, 1340 (2d Cir.1975) (similarity of sound relevant on confusion). However, I find that while the marks are clearly distinguishable when placed side by

---

2. It should also be noted that plaintiff's registration of its mark is "prima facie evidence of registrant's exclusive right to use the registered mark." 15 U.S.C. § 1115(a).

side, there are sufficiently strong similarities to create the possibility that some consumers might believe that the two marks emanated from the same source. The similarities in sound and association also create the possibility that some consumers might mistake one mark for the other when seeing or hearing the mark alone. The extent to which these possibilities are "likely" must be determined in the context of all the factors present here.

### 3. Proximity of the Products

The relevance of product proximity to likelihood of confusion is apparent. Where the products in question are competitive, the likelihood of consumer confusion increases. See Lambda Electronics v. Lambda Technology, Inc., 515 F.Supp. 915, 926 (S.D.N.Y.1981).

In the instant case, both plaintiff and defendants sell children's clothing, although clothing is not currently the major business of the plaintiff. While there was testimony to the effect that the quality of the clothing sold by the plaintiff is inferior to that of the defendants, I do not find that any significant quality difference exists. Consequently, I find that the plaintiff and defendants currently are direct product competitors.

### 4. The Likelihood that Plaintiff Will "Bridge the Gap"

In the likelihood of confusion context, "bridging the gap" refers to two distinct possibilities; first, that the senior user presently intends to expand his sales efforts to compete directly with the junior user, thus creating the likelihood that the two products will be directly competitive; second, that while there is no present intention to bridge the gap, consumers will assume otherwise and conclude, in this era of corporate diversification, that the parties are related companies. See McGregor-Doniger, Inc. v. Drizzle, Inc., supra, 599 F.2d at 1135–36; Lambda Electronics v. Lambda Technology, supra, 515 F.Supp. at 926. I find both possibilities present here.

As noted earlier, plaintiff and defendants already are direct competitors. In addition, plaintiff has current plans to expand its sale of children's clothing and thereby further bridge any gap that might still exist. These expansion plans of the plaintiff contemplate the opening of stores that will be very similar in format to those of the defendants, in that they will sell exclusively children's clothing. Thus, plaintiff and defendants are and will be close competitors. Further, I find that the possibility exists that consumers seeing the Kids 'r' Us store and mark might assume that the defendants are in some manner an extension of the plaintiff's business. I base this conclusion on the similarity of the marks, the similarity of the products offered, and the analogous mental images (children's products) conveyed by the two marks.

### 5. Evidence of Actual Confusion

 Evidence of actual confusion is a strong indication that there is a likelihood of confusion. Narwood Products v. Lexington Broadcast Services Co., Inc., supra, 541 F.Supp. at 1251. It is not, however, a prerequisite for the plaintiff to recover. See McGregor-Doniger, Inc. v. Drizzle, Inc., supra, 599 F.2d at 1136.

In the instant case, despite the fact that plaintiff and defendants have co-existed for five years, I find no evidence of actual confusion. The only evidence plaintiff sought to introduce regarding actual confusion was a survey that it had commissioned. This survey, however, was excluded at trial. Although I stated on the record my reasons for excluding it, I will address this issue in greater detail in a subsequent portion of this opinion.

### 6. Junior User's Good Faith

The state of mind of the junior user is an important factor in striking the balance of the equities. See Lambda Electronics v. Lambda Technology, Inc., 515 F.Supp. 915, 929 (S.D.N.Y.1981). In the instant case, Mr. Pomeranc asserted at trial that he did not recall whether he was aware of the plaintiff's mark when he chose to name his store Kids 'r' Us in 1977.

I do not find this testimony to be credible. Plaintiff opened its Toys "R" Us store on Flatbush Avenue on November 15, 1975. Approximately two years later, defendants opened their Kids "r" Us store at 9419 Avenue L, within two miles of the Toys "R" Us store. In view of the proximity of the stores, the overlapping of their products, and the strong advertising and marketing effort conducted by the plaintiff for a considerable amount of time prior to the defendants' adoption of the name Kids 'r' Us, it is difficult to believe that the defendants were unaware of the plaintiff's use of the Toys "R" Us mark.

Consequently, I find that the defendants adopted the Kids 'r' Us mark with knowledge of plaintiff's mark.[3] I find as well that the defendant's testimony concerning his initial use of the Kids 'r' Us mark was so vague and evasive as to give rise to the inference that he was attempting to conceal the fact that he adopted his mark with knowledge of the plaintiff's mark. I also regard that testimony as evidence of the defendant's bad faith in adopting and utilizing the Kids 'r' Us mark. Such a lack of good faith is relevant not only in balancing the equities, but also is a factor supporting a finding of a likelihood of confusion. As was noted in *E.I. duPont de Nemours & Co. v. Yoshida International, Inc.,* 393 F.Supp. 502, 514 (E.D.N.Y.1975):

> "On the assumption that a businessman will ordinarily act to his commercial advantage, and that the attraction of an established business' good will to the newcomer's product is such an advantage, the inference to be drawn from imitation is the imitator's own expectation of confusion as to the source of origin of his product. Where, as here, there is little to distinguish the marks themselves and the prior mark is a long-established one of which the newcomer was aware, doubts about intent are resolved against the newcomer, and a reasonable explanation of its choice is essential to establish lack of intent to deceive." (citations omitted).

### 7. *Quality of the Junior User's Product*

■ If the junior user's product is of a low quality, the senior user's interest in avoiding any confusion is heightened. *Lambda Electronics v. Lambda Technology, Inc., supra,* 515 F.Supp. at 929. In the instant case, there is no suggestion that the defendants' products are inferior, and this factor therefore is not relevant.

### 8. *Sophistication of the Purchasers*

The level of sophistication of the average purchaser also bears on the likelihood of confusion. Every product, because of the type of buyer that it attracts, has its own distinct threshold for confusion of the source of origin. *See Taylor Wine Co. v. Bully Hill, Vineyards, Inc.,* 569 F.2d 731, 733 (2d Cir.1978).

The goods sold by both plaintiff and defendants are moderately priced clothing articles, which are not major expenditures for most purchasers. Consumers of such goods, therefore, do not exercise the same degree of care in buying as when purchasing more expensive items. Further, it may be that the consumers purchasing from the plaintiff and defendants are influenced in part by the desires of their children, for whom the products offered by plaintiff and defendants are meant. A common, if not nagging, experience of parenthood is the coercion of children that their clothing be of a current style and purchased in a designated place. Those vigorous promptings of children to which parents not infrequently succumb make the children, in reality, the true purchasers with the resultant lowering of the level of sophistication.

### 9. *Junior User's Goodwill*

■ Although not specifically enunciated in *Polaroid,* "a powerful equitable argument against finding infringement is created when the junior user, through concurrent use of an identical trademark, develops

---

**3.** Also relevant is Title 15 U.S.C. § 1072, which provides that registration of a mark on the principal register "shall be constructive notice of the registrant's claim of ownership thereof." The plaintiff, however, does not appear to rely on this provision.

goodwill in the mark." *Lambda Electronics v. Lambda Technology, Inc., supra,* 515 F.Supp. at 929, citing *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 49 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

Although this consideration was enunciated in the context of non-competing goods, it is nonetheless significant to note here that the defendants have failed to demonstrate a significant development of goodwill in their mark. Defendants have not expended large sums advertising their store or promoting its name. Further, it appears that most of the defendants' customers are local "repeat shoppers," who come to the Kids "r" Us store primarily because of their own past experiences with it. (Transcript pp. 576–80). In light of this lack of development of goodwill, I find that the defendants do not have a strong equitable interest in retaining the Kids "r" Us mark.

*Conclusion on Likelihood of Confusion*

■ The determination of whether a likelihood of confusion has been established here is a difficult one, for there clearly are factors cutting both ways. After thoroughly considering all of the relevant factors, however, I find that the defendants use of the Kids 'r' Us mark does create a likelihood of confusion for an appreciable number of consumers.

In reaching this determination, I place primary importance on the strong secondary meaning that the plaintiff has developed in its mark, the directly competitive nature of the products offered by the plaintiff and defendants, the plaintiff's substantially developed plans to open stores similar in format to those of the defendants', the lack of sophistication of the purchasers, the similarities between the marks, the defendants' lack of good faith in adopting the mark, and the limited goodwill the defendants have developed in their mark.

While I do not find that consumers would necessarily be confused when examining the two marks side by side, this type of confusion is not required in order for the plaintiff to prevail here. Rather, I find that three other forms of confusion are likely.

First, I find that by utilizing the phrase " 'r' Us" in a mark employed to sell products so closely related to the plaintiffs, there is a strong likelihood that consumers will be attracted to the defendants' mark believing that the defendants' store has some connection with the plaintiff. The defendants' mark will thereby attract customers as a consequence of the strong reputation built by the extensive advertising and marketing efforts of the plaintiff, a result I find the defendants intended to achieve. As the Second Circuit stated in *Grotrian, Helfferich, Schulz, et al. v. Steinway & Sons, supra,* 523 F.2d at 1342: "The harm to [plaintiff] in short is the likelihood that potential ... purchasers will think that there is some connection between [plaintiff's and defendant's products]." *See also Cork 'N Cleaver of Colorado, Inc. v. Keg 'N Cleaver of Utica, Inc.,* 192 U.S.P.Q. 148 (N.D.N.Y.1975) (*Cork 'N Cleaver v. Keg 'N Cleaver*); *Masterpiece of Penn., Inc. v. Consolidated Novelty Co.,* 368 F.Supp. 550 (S.D.N.Y.1973) (*Mountain King v. Alpine King*); *General Foods v. Ocean Spray Cranberries, Inc.,* 199 U.S.P.Q. 246 (T.T.A.B.1978) (*Shake 'N Bake and Batter 'N Bake v. Dip 'N Bake*); *D.J. Bielzoff Products Co. v. White Horse Distillers, Ltd.,* 27 Cust. & Pat.App. 722, 107 F.2d 583 (Cust. & Pat.App.1939) (*Whitehorse and Blackhorse Whiskeys v. Redhorse*).[4]

Second, I find that a likelihood exists that even those purchasers who do not consciously assume that the plaintiff and defendants are related entities will be attracted to the defendants' store on the basis of the goodwill established by the plaintiff. As Judge Sofaer observed in *Playboy Enterprises,*

---

**4.** A similar conclusion was reached by the Trademark Trial and Appeal Board in *Toys "R" Us, Inc. v. R. Sarway Handbag Co.* (April 19, 1982). The Board cancelled the registration of the mark Bags R' Us, finding that "purchasers, upon seeing respondent's 'Bags R' Us' handbags would believe that said goods were somehow associated with or originated from petitioner."

Inc. v. Chuckleberry Publishing, Inc., 486 F.Supp. 414, 428 (S.D.N.Y.1980), confusion exists where a defendant is able "to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's well known name." I find here that the defendants' use of a name so similar in sound and association to that of the plaintiff's was an attempt to trade on the plaintiff's goodwill, and, as such, creates a likelihood of associational confusion. See id. ("Playboy" v. "Playmen"); Londontown Manufacturing Co. v. Cable Raincoat Co., 371 F.Supp. 1114, 1118 (S.D.N.Y.1974) ("London Fog" v. "Smog").

Third, I find that some purchasers when confronted with the defendants' mark alone might confuse it with the plaintiff's. As the Seventh Circuit noted in Northam Warren Corp. v. Universal Cosmetic Co., 18 F.2d 774, 775 (7th Cir.1927):

"Whether there is infringement of a trademark does not depend upon the use of identical words, nor on the question as to whether they are so similar that a person looking at one would be deceived into the belief it was the other; but it is sufficient if one adopts a trade-name or trademark so like another in form, spelling or sound that one, with a not very definite or clear recollection of the real trademark, is likely to be confused or misled."

See also American Home Products v. Johnson Chemical Co., 589 F.2d 103, 107 (2d Cir.1978) ("Roach Motel" v. "Roach Inn"); American Association for the Advancement of Science v. Hearst Corp., 498 F.Supp. 244 (D.D.C.1980) ("Science" Magazine v. "Science Digest"). While I do not find this third type of confusion sufficiently likely to be dispositive on its own, I have considered it as a factor in my decision and conclude that it assumes greater significance when linked with the other two.

Although I am cognizant of the fact that no actual confusion has been established here, I find that this factor does not outweigh those which drive me to a finding of a likelihood of confusion. In this regard I am strongly influenced by the plaintiff's current plans to open stores that sell clothing exclusively, and the defendants' plans to expand its current operation to include other stores. Such parallel development significantly enhances the possibility of actual confusion in the future, even if the plaintiff proceeds using a different variation of the "R Us" mark (such as Togs "R" Us which it has already registered). It is relevant to note in this connection that the trademark laws protect the interest of the senior user in being able at some future date to "expand his business into the related field in which the junior user is operating." Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 613 (2d Cir.1960). Accord, Scarves by Vera, Inc. v. Todo Imports, Inc., 544 F.2d 1167, 1172 (2d Cir.1976).

Finally, I note that in reaching my determination on the question of confusion I am highly conscious of the language of the Second Circuit in American Home Products v. Johnson Chemical Co., supra, 589 F.2d at 107. The Court there observed that "[o]ne who adopts the mark of another for similar goods acts at his own peril and any doubt concerning the similarity of the marks must be resolved against him." Accord, Squirtco v. Tomy Corp., 697 F.2d 1038, 1041 (Fed.Cir. 1983). See also A.T. Cross Company v. Jonathan Bradley Pens, Inc., 470 F.2d 689, 692 (2d Cir.1972) (Friendly, J.) ("It should be known by this time that this Court does not look with much favor on the businessman who, out of the wealth of words available, chooses as a trademark one which comes as close as he dares to a well-known mark on the identical product").

Having found that the plaintiff has demonstrated a likelihood of confusion as to source by the defendants' use of the Kids 'r' Us mark, I conclude that the plaintiff has established a cause of action for trademark infringement pursuant to 15 U.S.C. § 1114(1) and for false designation of origin pursuant to 15 U.S.C. § 1125(a).

*Survey Evidence*

I now turn to the exclusion from evidence of the survey. For the purpose of establishing the existence or the likelihood of confusion that would be engendered in the minds

of consumers between the plaintiff's name and the defendants', the plaintiff sought to introduce in evidence a survey conducted by the Sorenson Marketing/Management Corporation entitled, "Consumer Perception of Children's Merchandise Store Names—A Study in Three Counties." The plaintiff also sought to introduce the opinion of an expert, Dr. Robert C. Sorenson, based upon that survey. The defendants' objections to the admissibility of the survey and the opinion were sustained by the Court and neither was received in evidence.

It might be observed at the outset that since the case was tried to the Court without a jury, those evidentiary rulings were unwise in that the simpler and surely the safer course would have been to receive the evidence and then ignore it or give it such weight as the Court thought appropriate. If the evidence were received erroneously, the trial judge would, in all likelihood, be the beneficiary of an appellate court's charitable presumption that in reaching his decision, he relied only on evidence that was properly received. *See, e.g., United States v. 396 Corp.,* 264 F.2d 704 (2d Cir.) *cert. denied,* 361 U.S. 817, 80 S.Ct. 60, 4 L.Ed.2d 64. A pragmatic view for receiving questionable evidence is expressed in *Builders Steel Co. v. C.I.R.,* 179 F.2d 377 (8th Cir. 1950) at page 379:

> In the trial of a non-jury case, it is virtually impossible for a trial judge to commit reversible error by receiving incompetent evidence, whether objected to or not. An appellate court will not reverse a judgment in a nonjury case because of the admission of incompetent evidence, unless all of the competent evidence is insufficient to support the judgment or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would not otherwise have been made .... On the other hand, a trial judge who, in the trial of a non-jury case, attempts to make strict rulings on the admissibility of evidence, can easily get his decision reversed by excluding evidence which is objected to but which, on review, the appellate court believes should have been admitted.

The premises upon which those views are based are that juries, either because they are unsophisticated or irrational, or both, must be shielded from inadmissible evidence whereas judges, by virtue of their special training, can rationally and unemotionally reach a decision completely ignoring the improper evidence. In assuming that the judge will completely ignore the improper evidence, it must also be assumed that the judge either admitted the evidence knowing it to be improper or, having mistakenly thought the evidence to be admissible, later discovered his mistake and disregarded that evidence.

No useful purpose would be served by belaboring the intrinsic merit of those premises and assumptions beyond stating them. *See Note, Improper Evidence in Nonjury Trials: Basis for Reversal?,* 79 Harv.L.Rev. 407 (1965). *Cf. McCormick on Evidence* (2d Ed.) § 60; *Davis, Hearsay in Nonjury Cases,* 53 Harv.L.Rev. 1362 (1970). Suffice it to say there is nothing in the Federal Rules of Evidence to suggest that those Rules do not apply alike in jury and nonjury cases and there is room for skepticism on the point that judges will rely only upon what is admissible and disregard the rest. *See 1 Louisell and Mueller,* Federal Evidence § 4; *United States v. Tucker,* 552 F.2d 202, 208, n. 3 (7th Cir.1977) ("To inject into the trial judge's mental processes the un-crossexamined statement ... without justification placed the judge in the difficult position of finding the facts as if he had heard nothing from the informer, when in fact he had read what was represented as the informer's statement."); *Dann v. Sands,* 38 A.D.2d 661, 327 N.Y.S.2d 222 (3d Dept. 1971); *Matter of Leon RR,* 48 N.Y.2d 117, 421 N.Y.S.2d 863, 397 N.E.2d 374 (1979) at p. 122, 421 N.Y.S.2d 863, 397 N.E.2d 374:

> The [trial] court indicated ... that while the entire file would be received in evidence it would disregard all matters which would not survive a hearsay challenge. This was error. That this facile system cuts across the grain of our adversary system is obvious. But, more important, it raises a substantial probability of

irreparable injury to a party's case for there is simply no way of gauging the subtle impact of inadmissible hearsay on even the most effective trier of fact.

Turning first to the survey itself which was offered in evidence and excluded, that document, entitled as previously indicated, "Consumer Perception of Children's Merchandise Store Names," consists of a statement of the purpose of the study, the method followed to conduct it, the findings, and a variety of computer generated tables. Dr. Robert C. Sorenson, under whose auspices the survey was conducted, was qualified as an expert. He testified on behalf of the plaintiff as to the purposes for which he was retained and the steps he took thereafter to perform his assignment.

In broad outline, he testified that interviews were conducted through the random intercept method (Tr. 167). The persons thus randomly intercepted were interviewed in accordance with a screener and a general questionnaire that was designed by him. He described the universe from which the randomly intercepted representative sample was to be drawn (Tr. 170). The actual interviewing was done by persons supplied by Ideal Research, an interviewing organization retained by Sorenson Marketing/Management Corporation. The interviewers supplied by Ideal were briefed primarily by Mr. Sorenson's assistant, Ms. Tonjes. Mr. Sorenson was present for only a short period during the briefing session (Tr. 172–175). The interviews were to be conducted at three locations made known to the interviewers orally (Tr. 183–185). Those locations were the Cross County Shopping Center in Yonkers, the Green Acres Shopping Center in Nassau County and the Kings Plaza Shopping Center in Brooklyn. The Brooklyn site was selected to assure that no one would be included in the study who had just walked out of or just walked by either store (Tr. 184). He also believed that pedestrian traffic was not possible between the plaintiff's Flatbush Avenue store and the Kings Plaza site (Tr. 185). In general, the interview locations were selected because it is a good practice to interview in a purchasing environment

for such a survey (Tr. 247–248). The interviewers were instructed, among other things, that persons should be interviewed by themselves, and not permit others to listen in on the interview (Tr. pp. 180, 255).

Dr. Sorenson conceded that he had no knowledge of what the interviewers actually did in conducting the interviews and that he had no personal knowledge of whether they, in fact, followed the instructions they were given at the briefing session (Tr. 191). Four hundred and fifty persons were interviewed, although the computer tabulation "which was necessarily done in a hurry" (Tr. 195) indicates 451.

When the interviews were concluded and the questionnaires completed, they were edited by Ideal Research (Tr. 197). The questionnaires were then returned to Sorenson Marketing/Management Corporation for coding which is a process of content analysis (Tr. 197–199). In coding the responses, those that Sorenson believed indicated confusion of Toys "R" Us and Kids 'r' Us were marked with an asterisk (Tr. 224–225). Punch cards were then prepared based upon the coding process. The punch cards were utilized for computer purposes. The computer work was subcontracted to be done by persons described simply as the Gutman group (Tr. 199–200). Another company, Delta Market Research, was also engaged by Sorenson to conduct a validation study (Tr. 228–229). Excluding the 450 persons interviewed, more than twenty persons in addition to himself were relied upon by Sorenson for the completion of the survey report. Those persons included interviewers, editors, validators, keypunch operators and computer operators, all of whom were not in Sorenson's employ but were employed by others to whom various portions of the compilation of the survey report were delegated as subcontractors.

The testimony established that validity of the survey results would be compromised by the failure of one or more of the persons thus relied upon to either follow instructions or to do their respective tasks competently (Tr. 238–243).

The testimony also established that it was vital that the interviewers were not aware that the survey was being conducted for Toys "R" Us. That name was not to be mentioned to them during their briefing or at any other time (Tr. pp. 180, 304, 305, 356). It appears, however, that one of the interviewers stated that she was instructed not to interview on the block on which Toys "R" Us was located (Tr. 250). It also appears that during the briefing of the interviewers, one was heard to whisper to another that the survey was being conducted for Toys "R" Us (Tr. 250–253). Sorenson and his assistant concluded that the incident was best ignored rather than have the interviewer eliminated and by so doing lend credence to her speculation of the survey's sponsor (Tr. 251).

It also appeared that a significant number of interviews were conducted in a bowling alley. Dr. Sorenson opined, however, that a bowling alley was a purchasing environment (Tr. 248) and satisfied one of the prerequisites for an effective survey, namely, that interviews be conducted in such an environment.

There was evidence that persons who were present when another was being interviewed and overheard the substance of the interview were immediately thereafter interviewed contrary to good practice (Tr. pp. 256, 326–327). The extent to which such deviation from good practice might affect the accuracy of the data could not be stated (Tr. 256).

With respect to the method by which the interviews were validated by Delta Market Research, Dr. Sorenson testified that he was unfamiliar with the industry practice, if any, as to validation. He also testified that it would have been desirable to determine, in the course of the validation process, whether the persons interviewed met the screening criteria, although that was not done in this case and there was no reason why it was not (Tr. 269).

Other deficiencies in the survey data included inaccuracies in one of the computerized tables designed to reflect confusion (Tr. 280–285) and responses inaccurately recorded (Tr. pp. 328–330).

Following my refusal to receive the survey in evidence for the reason that I was not satisfied that it reflected sufficient indicia of trustworthiness, the plaintiff was permitted to call another expert in another effort to persuade me that my ruling was incorrect. That person was Dr. Henry Assael, Professor of Marketing and Chairman of the Marketing Department at New York University. Dr. Assael testified that given a random intercept survey method, one could not project the percentage of confusion to the total universe (Tr. 395, 398, 399, 435) nor could he say with any precision what the exact amount of confusion is. The survey offered nevertheless concluded that 24.0% of the survey respondents indicated their confusion. When asked whether the interviewer who whispered Toys "R" Us at the briefing session should have been excused, he said, "It might have been safer to not have that interviewer do interviews," and that he would have excluded that interviewer from the process (Tr. 405). Dr. Assael also testified that a bowling alley is obviously not a purchasing environment (Tr. 410) and disagreed that each of the coded items that were asterisked would indicate confusion (Tr. 433).

It would be an affectation of research to cite the many cases in which surveys have been received in evidence. In what is perhaps the leading case, *Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670 (S.D.N.Y.1963), the Court wrote, at page 682:

> Surveys are now admitted over the hearsay objection on two technically distinct bases. Some cases hold that surveys are not hearsay at all, other cases hold that surveys are hearsay but are admissible because they are within the recognized exception to the hearsay rule for statements of present state of mind, attitude or belief. Still other cases admit surveys without stating the ground on which they are admitted. (footnote references omitted).

In countless other cases survey evidence is received without regard to a determina-

tion as to whether such evidence is or is not hearsay if resort to such evidence is necessary and circumstantial guarantees of trustworthiness are present. *See, e.g., Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 505 F.Supp. 1313, 1321–1330 (E.D.Pa.1980); *Grotrian, Helfferich, Schulz, et al. v. Steinway & Sons, supra,* 523 F.2d 1331, 1341 (2d Cir.1975) ("We are mindful of the ongoing dispute as to whether a survey should be admissible as non-hearsay under the state of mind exception to the hearsay rule or based on the need for it plus adequate guarantees of trustworthiness."); *Manual for Complex Litigation,* 112, 133 (5th Ed. 1981).

▪ Accepting necessity and genuine guarantees of trustworthiness to be the correct bases for receiving survey evidence, Rules 803(24), 804(b)(5), Fed.R.Evid., it is for the court to determine whether those bases are present. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., supra,* at 1325, 1326; *3 Louisell and Mueller,* Federal Evidence § 472 at 946 (1979).

▪ The trustworthiness of surveys depends upon foundation evidence that (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. Failure to satisfy one or more of these criteria may lead to exclusion of the survey. *Manual for Complex Litigation,* 116 (5th Ed.1981); *4 Louisell and Mueller, Federal Evidence* § 472 at 957 (1979); *McCarthy, Trademarks and Unfair Competition* § 32:53 (1973).

The necessary foundation will normally be laid through the testimony of the persons responsible for the various parts of the survey. *Manual for Complex Litigation, supra; McCarthy, Trademarks and Unfair*

*Competition* § 32:53 (1973) ("The presentation of survey evidence at trial should include the testimony of the following witnesses: The survey director, the survey supervisor, interviewers, interviewees); *Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670, 681–682 (S.D.N.Y.1963) ("Two of the interviewers testified that they were experienced in interviewing, explained the manner in which the interviews were conducted and stated that they did not know the purpose of the surveys."). *See also 5 Louisell and Mueller, Federal Evidence* § 522 at 146–148 (1979).

▪ The testimony regarding the survey as recounted above, together with the absence of any testimony by others who were responsible for the various parts of the survey falls far short of satisfying the foundation requisites and raised doubts in my mind concerning the trustworthiness of the survey serious enough to compel me to exclude it.

Having excluded the survey, I also excluded the opinions of the experts which were based on that survey. *See* Rule 703, Fed.R.Evid.; *Standard Oil Co. v. Moore,* 251 F.2d 188, 122 (9th Cir.1957), *cert. denied,* 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958) ("It is for the trial court to determine, in the exercise of its discretion, whether the expert's sources of information are sufficiently reliable to warrant reception of the opinion"); *3 Louisell and Mueller, Federal Evidence* § 387 at 652 (1979) ("Rule 703 does not abdicate judicial responsibility to the expert, for it leaves room for rejection of testimony if reliance on the facts or data is unreasonable."). *See also Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 505 F.Supp. 1313, 1321–1330 (E.D. Pa.1980). In sum, both the survey and the expert opinions based on the survey were excluded because I did not find them to have sufficient indicia of trustworthiness. *See Weinstein and Berger, Weinstein's Evidence,* 901–111 *et seq.* for a succinct and comprehensive discussion of the applicable principles.

*New York's Anti-dilution Statute*

Plaintiff also alleges a pendent state claim pursuant to New York State's anti-dilution statute, N.Y.Gen.Bus.Law § 368–d (McKinney 1968). The statute provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

While this case was being tried, the Court of Appeals for the Second Circuit decided the case of *Sally Gee, Inc. v. Myra Hogan, Inc., Myra Hogan and Sally Lee,* 699 F.2d 621 (2d Cir.1983). In *Sally Gee* the Second Circuit affirmed the district court's dismissal of plaintiff's Lanham Act claims of trademark infringement and false designation of origin, as well as pendant state claims of trademark infringement, unfair competition and dilution of trademark. Fortuitously, the appellate court's opinion focused on "clarify[ing] the elements necessary for a cause of action under New York's 'anti-dilution' statute." *Id.* at 624.

Relying primarily on *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977), the Second Circuit held that the only elements necessary for a cause of action under the anti-dilution statute are the possession of a truly distinctive trademark and likelihood of dilution. Noting the equitable nature of the statutory remedy, however, the court observed that the good faith of the junior user was also a factor to be considered in evaluating a claim for injunctive relief. Taking the text of the statute at face value, the court also held that neither competition between the parties nor likelihood of confusion as to source are necessary elements of the cause of action.

The Second Circuit's opinion does not clearly define either "distinctiveness" or "likelihood of dilution." Rather, on the facts of the case before it, the court found that defendant's trademark was unlikely to dilute plaintiff's trademark and therefore affirmed the district court's dismissal of the cause of action. The court's opinion does, however, indicate some key factors which must be considered in evaluating claims of distinctiveness and dilution.

Concerning distinctiveness the Second Circuit noted that under *Allied,* the anti-dilution statute protects trademarks that are truly distinctive or that have acquired secondary meaning. The court acknowledged, however, that the legislative history of the statute, the dissenters in *Allied* and several commentators suggest that anti-dilution protection may only be extended to the "most well known names," *Allied, supra,* 42 N.Y.2d at 548, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (Cooke, J. dissenting), *cited in Sally Gee, supra,* at 625, or even only " 'famous' or 'celebrated' marks." *Id. citing* 2 J. McCarthy, *Trademarks and Unfair Competition* § 24:14 at 162–63 (1973); *Note, Dilution: Trademark Infringement or Will-O'-The Wisp?,* Harv.L.Rev. 520, 530 (1964).

Although there is thus some dispute as to the scope of protection of the anti-dilution statute, the New York Court of Appeals' decision in *Allied, supra,* is plain in stating that if a mark has acquired secondary meaning, it is protected. The court stated that "only those trade names which are truly of *distinctive* quality or which have acquired a secondary meaning in the eye of the public should be entitled to protection under the anti-dilution statute." 42 N.Y.2d at 546, 399 N.Y.S.2d 628, 369 N.E.2d 1162. In defining "secondary meaning" the court said,

To establish secondary meaning it must be shown that through exclusive use and advertising by one entity, a name or a mark has become so associated in the mind of the public with that entity or its product that it identifies the goods sold by that entity and distinguishes them from goods sold by others.

*Id. citing Truck Equip. Serv. Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1219 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

In *Truck Equip. Serv. Co., supra,* the Court of Appeals for the Eighth Circuit relied upon its earlier decision in *Shoppers Fair of Arkansas, Inc. v. Sanders Co.,* 328 F.2d 496 (8th Cir.1964), for a definition of "secondary meaning." In *Shoppers Fair,* the Court stated,

> "[A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods ... may become so associated in the public mind with such goods ... that it serves to identify them and distinguish them from the goods ... of others. When such an association exists, the name, mark, or symbol is said to have acquired a 'secondary meaning,' in which the original user has a property right which equity will protect against unfair appropriation by a competitor."

*Shoppers Fair, supra,* 328 F.2d at 499, *quoting Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas,* 185 F.Supp. 895, 903 (E.D.Ark. 1960), *quoted in Truck Equip. Serv. Co., supra,* 536 F.2d at 1219.

The evidence presented at trial indicates that plaintiff's trademark Toys "R" Us has acquired secondary meaning as defined in *Allied,*[5] *Truck Equip. Serv. Co.* and *Shoppers Fair.* Plaintiff has used its trademark since 1960 to identify and distinguish its stores and the items sold and promoted therein. At the time plaintiff adopted Toys "R" Us and registered the trademark with the United States Trademark Office, it knew of no other company employing the phrase "R" Us in connection with its business. *See* Testimony of Charles Lazarus, Chairman of Toys "R" Us (Tr. 122). Furthermore, plaintiff was unaware of any infringing uses of the "R" Us designation until the early to mid-1970's, at which time it adopted a policing policy designed to protect its mark. This policing policy has been enforced by plaintiff since its adoption.

Since 1975, Toys "R" Us has spent over 75 million dollars to advertise, publicize and promote on television and radio and in various print media its stores and the sale of its products and services. During that time, plaintiff has spent in excess of two million dollars on television advertising in the New York area alone. As has already been indicated, plaintiff owns and operates 144 Toys "R" Us stores in thirty markets throughout the United States, including fifteen stores in the State of New York.

 Thus, for over twenty years plaintiff has used its validly registered trademark and in good faith enforced its rights to the mark against known infringers. Furthermore, plaintiff has expended substantial sums to advertise its trademark, thereby causing its mark to "become so associated in the public mind with [its stores and] goods ... that it seems to identify them and distinguish them from the [stores and] goods ... of others." *Truck Equip. Serv. Co., supra,* 536 F.2d at 1219, *quoting Shoppers Fair, supra,* 328 F.2d at 499. Plaintiff's proof at trial, more specifically, its dollar sales volume, convincingly established that its unique use of an inverted capital R in quotation marks between the words "Toys" and "Us" has become well known to the consuming public as identifying plaintiff's stores and products, distinguishing them from other toy stores and children's products. Therefore, I conclude that plaintiff's trademark Toys "R" Us has acquired secondary meaning as defined by the Court of Appeals of New York and is entitled to protection under New York's anti-dilution statute.

The second element necessary to a cause of action under the anti-dilution statute is

**5.** Defendants concede on page 16 of their pretrial memorandum of law "that plaintiff has secondary meaning in Toys "R" Us as applied to the sale of toys. This concession, however, is made in the context of defendants' discussion of trademark infringement. Recognizing the Second Circuit's admonition in *Sally Gee, supra,* that the strength of a mark for anti-dilution purposes should not be measured by referring to federal trademark law, I will analyze the strength of the Toys "R" Us mark by referring to the definition of "secondary meaning" enunciated by the Court of Appeals of New York in *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 543, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977), and the cases relied upon therein.

likelihood of dilution. The essence of dilution is the watering down of the potency of a mark and the gradual debilitation of its selling power. As distinguished from confusion, which causes an immediate injury, "dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark." *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1296 (S.D.N.Y.1972), *citing* 3 R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies* at 955–57. Similarly, the New York Court of Appeals in *Allied Maintenance Corp., supra,* recognized that the evil the anti-dilution statute sought to remedy is the "cancer like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trademark or name." 42 N.Y.2d at 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162, *cited with approval* in *Sally Gee, supra,* at 624.

Although competition between the parties is not necessary for a dilution claim, since dilution protects a mark's selling power, relief is available particularly in an area of normal expansion of the trademark owner's business. *See National Lampoon, Inc. v. American Broadcasting Co.*, 376 F.Supp. 733, 747 (S.D.N.Y.1974); *Fund of Funds, Ltd. v. First American Fund of Funds*, 274 F.Supp. 517, 526 (S.D.N.Y.1967).

The Second Circuit in *Sally Gee, supra,* observing that the concept of dilution is a nebulous one, relied upon the definition supplied by Callman:

> "Dilution is an act which 'threatens two separable but related components of advertising value. Junior users may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey.'" 3 R. Callman, *The Law of Unfair Competition, Trademarks, and Monopolies,* § 84.2, at 954–55 (footnote omitted).

*Sally Gee, Inc., supra,* at 625.

There is no suggestion that the children's clothing sold by Kids 'r' Us is inferior in quality to that sold by Toys "R" Us or that the Kids 'r' Us name tarnishes the affirmative associations that Toys "R" Us has come to convey. Therefore, the relevant inquiry is whether Kids 'r' Us blurs Toys "R" Us' product identification.

In *Sally Gee* the Second Circuit held that it is the "selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public which must be protected." *Sally Gee, supra,* at 624–625. The Court found that plaintiff, Sally Gee, had failed to establish that its trademark evoked images of its products in the minds of consumers sufficient to establish "associational qualities entitling it to protection from dilution." *Id.* Furthermore, the court held that the trade name SALLY LEE was unlikely to blur *Sally Gee's* product identification.

█ In the instant case, due to the extensive advertising conducted by plaintiff and its high sales volume, the trademark Toys "R" Us evokes in the minds of consumers images of a large warehouse-like store offering for sale at economical prices a large variety of toys and other child related products. This image provoking characteristic of the Toys "R" Us trademark establishes its associational qualities which entitle it to protection from dilution. Furthermore, although the two names are distinguishable, the identity of the "R" Us suffixes and the similarity of the children's products sold by the stores compels me to conclude that the name Kids 'r' Us is likely to blur Toys "R" Us' product identification. Clearly, the distinctiveness of plaintiff's mark is being "whittled away" by a proliferation of "R" Us names, including Kids 'r' Us, and the mark's accompanying selling power is being diluted.

Finally, the Second Circuit in *Sally Gee* noted the lack of predatory intent by the junior user in rejecting plaintiff's claim of dilution. In the instant case, defendant Pomeranc's testimony that he was unaware of Toys "R" Us at the time he adopted the name Kids 'r' Us was extremely evasive and lacked credibility. After evaluating his testimony, I firmly believe that he knew of Toys "R" Us when he adopted the Kids 'r' Us name for his business and that he intended to take advantage of the uniqueness of plaintiff's mark. Therefore, I find that

the equitable relief enjoining defendants from using the name Kids 'r' Us is warranted and should be granted.

*Laches*

Defendants assert the equitable doctrine of laches as a defense to plaintiff's claims. Specifically, they contend that plaintiff's failure to commence this lawsuit until four years after the opening of Kids 'r' Us precludes the relief they seek.

The Court of Appeals for the Second Circuit, in *Saratoga Vichy Springs Co., Inc. v. Lehman,* 625 F.2d 1037 (2d Cir.1980), has held that laches is available as a defense against both legal and equitable claims made under the federal trademark act as well as under New York's anti-dilution statute.[6]

The court adopted the laches rule as enunciated by Judge Weinfeld in *Cuban Cigar Brands, N.V. v. Upmann International, Inc.,* 457 F.Supp. 1090 (S.D.N.Y.1978).

"Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time."

*Id.* at 1096, *quoted in Saratoga Vichy Spring Co., Inc., supra,* 625 F.2d at 1040.

The chronological sequence in which the plaintiff's stores and defendants' store were opened has already been indicated. Suffice it to restate here that the defendant Pomeranc opened his Avenue L store to which he attached the mark Kids 'r' Us two years after the plaintiff opened its Flatbush Avenue Toys "R" Us store.

In approximately late September 1978, plaintiff's former trademark counsel, William R. Liberman, Esq., caused a search to be made for the names and addresses of entities operating under or otherwise employing the words " 'R' Us" as part of their names. In October 1978, Mr. Liberman's search disclosed an entity called "Kids 'r' Us, Inc." doing business at 9419 Avenue L in Brooklyn, New York. An awning outside of the store at 9419 Avenue L at that time bore the name, "Ralph's Children's Wear." On December 8, 1978, plaintiff's counsel, Shea & Gould, sent a letter by certified mail, return receipt requested, to Ralph's Children's Wear at 9419 Avenue L, Brooklyn, New York. The letter, which stated that the use of the name "Kids R Us" infringed on plaintiff's statutory and common law rights, was returned to sender marked "Addressee Unknown." The same letter was sent on December 22, 1978, by plaintiff's counsel, Shea & Gould, by certified mail, return receipt requested, addressed to Kids R Us, Inc., at 9419 Avenue L, Brooklyn, New York. This second letter was also returned to sender marked "Addressee Unknown." Two months later, in February 1979, defendant Pomeranc's 9419 Avenue L store was closed when the Rockaway Parkway store expanded. In April 1979, defendant Pomeranc changed the name of the corporation from Kids R Us, Inc. to Canarsie Kiddie Shop, Inc.

Plaintiff abandoned its efforts to reach Kids 'r' Us at 9419 Avenue L after the return of its second letter and was unaware of the Kids 'r' Us location at 1445–57 Rockaway Parkway until August 1982, when a new employee having knowledge of the Kids 'r' Us store joined the plaintiff company. Subsequently, on September 27, 1982, plaintiff's trademark counsel, McAulay, Fields, Fisher, Goldstein & Nissan, sent a letter to defendants by certified mail, return receipt requested, notifying defendants that they were infringing plaintiff's

---

**6.** The appellate court recognized, however, that laches may not be a defense to a claim for an injunction under New York law, " 'in the absence of elements creating an equitable estoppel.' " 625 F.2d at 1041, *quoting Cohn & Rosenberger v. Kaufman & Ruderman, Inc.,* 280 A.D. 241, 113 N.Y.S.2d 62 (App.Div. 1st 1952). In light of the holding, *infra,* that plaintiff's federal claims are not barred by laches, it is unnecessary to consider whether an injunction under New York's anti-dilution statute is barred by the doctrine of equitable estoppel. Having concluded that plaintiff was not on notice of defendants' use of the name Kids 'r' Us, it would be theoretically impossible to hold that defendant was misled or lulled into security by plaintiff. *See, Columbia Records, Inc. v. Goody,* 278 A.D. 401, 105 N.Y.S.2d 659 (App. Div. 1st 1951).

statutory and common law rights. Defendant Pomeranc admitted that he received this letter and discarded it. A second letter concerning the same subject matter was sent by certified mail, return receipt requested, to defendants by plaintiff's counsel on November 9, 1983. Defendant Pomeranc testified that he refused to accept this letter. This action was commenced on December 21, 1982.

As noted earlier, defendants have the burden, in asserting their laches defense, of proving:

1. plaintiff's knowledge of defendants' use of Kids 'r' Us,

2. plaintiff's undue delay in enforcing its rights, and

3. prejudice to defendants if plaintiff is permitted inequitably to assert its rights at this time.

Although it is clear that plaintiff failed to enforce its rights from December 22, 1978 until August 27, 1982, a period of almost four years, defendants have not met their burden of proving that plaintiff knew of defendants' Rockaway Parkway store prior to August 1982. Defendants' changed address early in 1979, the subsequent change of the corporate name from Kids "R" Us, Inc. to Canarsie Kiddie Shop, Inc., defendants' minimal and local advertising campaign as well as the predominantly local nature of defendants' clientele, all reinforce plaintiff's assertion that it was unaware of Kids 'r' Us at its present location from November 1978 until August 1982.

The plaintiff's president did testify that it was plaintiff's normal practice to send an investigator to visit the site of an alleged infringer and that he could not explain why, in this case, that was not done. I decline, however, to draw the inference from this omission that plaintiff had knowledge of the existence of Kids 'r' Us, particularly after two letters sent to the 9419 Avenue L store were returned marked, "addressee unknown."

In addition, it would be inequitable to penalize plaintiff for its delay in asserting

its rights when defendant Pomeranc knew of Toys "R" Us when he selected the name Kids 'r' Us with the intent to benefit from the distinctiveness and secondary meaning of plaintiff's prior and valid trademark. *See Saratoga Vichy, supra,* 625 F.2d at 1042 and cases cited therein.

*Remedy*

Having found in favor of the plaintiff on its three causes of action, the remaining question is the appropriate remedy to be fashioned. Because I find that the plaintiff will be irreparably harmed by the defendants' continued use of the Kids 'r' Us mark, the defendants are hereby permanently enjoined from (a) using the name or mark Kids 'r' Us or any colorable imitation of plaintiff's Toys "R" Us mark in connection with defendants' products, businesses or services, and (b) doing any other act likely to, or calculated to induce the belief that the defendants or the defendants' business are in any way connected with the plaintiff or plaintiff's products or business. The defendants shall have 60 days from the date of this order to effectuate the necessary changes. All other relief sought by the plaintiff is hereby denied.[7]

---

7. Having found that the defendants may no longer use the mark Kids 'r' Us, it is unnecessary to reach the defendants' counterclaims against the plaintiff.