**STERN'S MIRACLE–GRO PRODUCTS, INC., Plaintiff,**

v.

**SHARK PRODUCTS, INC., Defendant.**

No. 92 Civ. 9307 (PKL).

United States District Court, S.D. New York.

Feb. 16, 1993.

Abelman, Frayne & Schwab, New York City (Lawrence E. Abelman, Jeffrey A. Schwab, Norman S. Beier, Michael Aschen, of counsel), for plaintiff.

Steinberg & Raskin, New York City (Martin G. Raskin, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge:

This is an action for trademark infringement, false designation of origin, dilution and unfair competition. Plaintiff Stern's Miracle–Gro Products, Inc. ("Stern's"), producer of plant fertilizer products, has moved for a

preliminary injunction prohibiting defendant Shark Products, Inc. ("Shark") from infringing upon plaintiff's mark by marketing certain hair care products under the Miracle–Gro trademark. For the reasons stated below, the motion for a preliminary injunction is granted.

## BACKGROUND

Plaintiff Stern's markets a water soluble multi-purpose plant food under the trademark "Miracle–Gro." According to the complaint, Stern's predecessor in interest introduced this innovative water soluble plant fertilizer in 1951 and the product has been continuously sold and distributed in the United States since that time. Complaint, dated December 28, 1992, at ¶¶ 9, 10. Stern's licensor, Stern's Nurseries, Inc., is the owner of all rights to the federal trademark registration for the Miracle–Gro mark which issued on October 28, 1958 and is valid and subsisting. Complaint, at ¶ 11.

Stern's claims to be the premier retailer of water soluble fertilizers for home lawn and garden use in the United States. Complaint, at ¶ 9. It attributes the success of Miracle–Gro, in part, to its complete water solubility. According to Stern's, a home gardener can produce a gallon of liquid plant food simply by dissolving a tablespoon of Miracle–Gro powdered crystals into a gallon of clean water. Declaration of John Kenlon, dated December 23, 1992 ("Kenlon Declaration"), at ¶ 7. In addition, Stern's claims that, unlike traditional dry granular plant foods, Miracle–Gro can be applied safely during hot, dry spells without fear of plant fertilizer "burn." Kenlon Declaration, at ¶ 9. Moreover, Stern's states that its product starts to work within minutes of application and will lead almost immediately to spectacular results— bigger flowers, more color, more fruits and vegetables. Kenlon Declaration, at ¶ 9.

Plaintiff has extensively distributed advertising, promotional and informational materials throughout the United States which identify the Miracle–Gro brand fertilizer, including print and national television and radio campaigns. Complaint, at ¶ 12. In addition,

plaintiff's nationally distributed fertilizer packaging prominently bears the Miracle–Gro trademark. Complaint, at ¶ 12. Miracle–Gro brand plant food is sold in more than 40,000 retail stores in the United States. Kenlon Declaration, at ¶ 19.

Defendant Shark, a New York corporation, is a manufacturer and wholesale distributor of hair care products which are directed to the African ethnic community. Declaration of Brian K. Marks, dated January 13, 1993 ("Marks Declaration"), at ¶¶ 3, 5. Shark was incorporated in April, 1991 and in September, 1991 began selling a line of four ethnic hair care products under the African Pride trademark, including a hair, scalp and skin oil product, a leave-in tonic, an herbal hair conditioner, and an oil hair conditioner. In early 1992, Shark added two additional products to its African Pride line, namely a braid sheen spray and a hair and scalp spray. Shark recently has added a shampoo and conditioner to its African Pride line. Marks Declaration, at ¶¶ 5–9.[1]

Shark is the subject of this action because it distributes two hair care products, the herbal and oil hair conditioners, in packaging bearing the indicia "Miracle Gro." The "Miracle Gro" mark is prominently displayed on the products' labelling, along with reference to Shark's African–Pride trademark. *See* Marks Declaration, at Exhibit A.

Stern's filed this action on December 28, 1992, alleging that defendant has undertaken a concerted plan to trade upon plaintiff's reputation and goodwill by means of appropriating and infringing plaintiff's Miracle–Gro trademark and thereby causing public confusion as to the source, sponsorship or affiliation of its products, diluting the distinctive quality of plaintiff's unique and distinctive trademark, and causing injury to plaintiff's business reputation. Complaint, at ¶ 15.

The complaint seeks injunctive relief and damages under several causes of action including: (1) infringement of the registered Miracle–Gro trademark in violation of Section 32 of the Lanham Act, 15 U.S.C.

---

**1.** At some point during this period, Shark also began using the trademark "African Miracle" on certain of its products in conjunction with the African Pride line of ethnic care products.

§ 1114(1); (2) false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) unlawful dilution of the distinctive quality of Stern's trademark and injury to Stern's business reputation under New York General Business Law Section 368–d; and (4) unfair competition under New York common law.

On December 28, 1992, Stern's moved for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining defendant from engaging in the infringing activity. The Court held a hearing on January 19, 1993, at which time the parties presented oral argument on plaintiff's application for an injunction. At the hearing, Stern's requested an opportunity to reply in writing to Shark's opposition papers. The Court granted this request and, on January 26, 1993, Stern's reply papers were submitted. Since Stern's submitted a consumer survey in its reply papers, the Court granted Shark's request to file a sur-reply. The sur-reply was filed on February 1, 1993, and the motion is now fully submitted.

Accordingly, the Court has received extensive papers from both sides addressing the facts and the law as applicable to this matter, as well as oral argument. The Court does not believe that any additional proof is necessary to resolve the present application, and neither party has requested an opportunity to submit any additional proof.

### DISCUSSION

A party seeking a preliminary injunction " 'must demonstrate (1) irreparable harm should the injunction not be granted, and (2)

either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward [that] party....' " *King v. Innovation Books, A Division of Innovative Corp.*, 976 F.2d 824, 828 (2d Cir. 1992) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991)); *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992); *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 314–15 (2d Cir. 1982).

■ The issuance of a preliminary injunction is an extraordinary equitable remedy which should not be granted absent a clear showing that the moving party has met its burden of proof. *See Beech–Nut, Inc. v. Warner–Lambert Co.*, 480 F.2d 801, 803 (2d Cir.1973); *Berrigan v. Norton*, 451 F.2d 790, 793 (2d Cir.1971). With these basic principles in mind, the Court now turns to the merits of the preliminary injunction application in this case.

### I. LANHAM ACT CLAIMS

Plaintiff Stern's has brought causes of action under the Lanham Act for trademark infringement, 15 U.S.C. § 1114[2], and false designation of origin under 15 U.S.C. § 1125(a)[3]. It is well-settled that plaintiff must demonstrate likelihood of confusion in order to succeed on either of these claims under the Lanham Act. *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 570–71 (2d Cir.1993). Thus, plaintiff must show that " 'an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of

---

**2.** Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), provides in relevant part that:

Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

**3.** Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in relevant part that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

the goods in question.'" *Id.* (*quoting McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979)).[4] The Court finds that plaintiff has established a likelihood of success on the merits as to the "likelihood of confusion" issue with respect to the Lanham Act claims.

## A. The Polaroid Factors

■ In order to make this "likelihood of confusion" determination, the Court adheres to the multi-factor test set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). In *Polaroid*, the Second Circuit considered the following factors in assessing likelihood of confusion:

(a) the strength of the prior owner's mark;

(b) the similarity between the two marks;

(c) the competitive proximity of the products;

(d) the likelihood that the prior user will bridge the gap;

(e) actual confusion;

(f) the defendant's good faith;

(g) the quality of defendant's product; and

(h) the sophistication of the buyers.

*W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (*citing Polaroid Corp.*, 287 F.2d at 495). In applying this test, no single factor is dispositive, but rather the Court should "weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572; *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983).

### (1) Strength of the Mark

■ The "strength of the mark" analysis focuses on " 'the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source.' " *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (quoting *McGregor–*

*Doniger, Inc.*, 599 F.2d at 1131); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir.1988); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1225 (2d Cir.1987). A mark's strength is measured by two factors: "(1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572.

■ Having carefully reviewed the record in this case, the Court finds that the Miracle–Gro mark is a strong mark based upon the conceptual distinctiveness of the mark, as well as the secondary meaning which the mark has acquired in the mind of the public.

First, the term "Miracle–Gro" is an inherently strong mark. The Second Circuit, in the infringement context, has developed four categories to aid in determining the inherent distinctiveness of a mark: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). The Second Circuit has defined these categories as follows:

A generic mark is generally a common description of goods and is ineligible for trademark protection.... A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established.... A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use "imagination, thought, and perception to reach a conclusion as to the nature of goods...." Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and "with ease of establishing infringement."

*W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (citations omitted). The Second Circuit has noted that "[s]uperimposed on this framework is the rule that registered trademarks are presumed to be distinctive and should be afforded the utmost protection." *Lois*

---

4. The Court finds that Stern's is the exclusive licensee of the federal trademark registration for Miracle–Gro and that defendant appropriated the mark without the consent of Stern's. Therefore, the only issue which must be addressed by the Court is whether Shark's appropriation of the Miracle–Gro mark is likely to cause confusion.

*Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986); *McGregor–Doniger Inc.,* 599 F.2d at 1132.

While the Miracle–Gro mark is difficult to categorize, the Court finds that the mark should be considered "suggestive" because of the unique combination of terms, accompanied by the misspelling of "Grow." [5] While "growth" or "grow" is a characteristic that one would expect to be common in describing or naming a plant food product, Stern's predecessor in interest transformed this common term into a conceptually distinct mark by misspelling the word "grow" as "gro" and then adding the word "miracle." This combination of terms, accompanied by the misspelling, provide Stern's with a suggestive mark that requires at least some thought or perception by a consumer as to the nature of the product.

More importantly, the Court finds that the Miracle–Gro mark has established a secondary meaning in the mind of consumers. The Second Circuit has stated that " '[t]o establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1041 (2d Cir.1992) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (citation omitted)). Therefore, "the crux of the doctrine of secondary meaning 'is that the mark comes to identify not only the goods, but the source of those goods,' *even though the relevant consuming public might not know the name of the producer.*" *Centaur Communications, Ltd.,* 830 F.2d at 1226 (emphasis added) (quoting *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987)).

Secondary meaning is a factual determination which "entails vigorous evidentiary requirements." *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985) (quotation omitted). The indicia which are commonly recognized as tending to show secondary meaning are (1) advertising expenditures; (2) consumer studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *See Thompson Medical Co.,* 753 F.2d at 217; *American Direct Marketing, Inc. v. Azad Int'l, Inc.,* 783 F.Supp. 84, 92 (E.D.N.Y.1992); *Sage Realty Corp. v. Sage Group, Inc.,* 711 F.Supp. 134, 143 (S.D.N.Y.1989); *see also Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1197 (E.D.N.Y.1983) ("through plaintiff's advertising and marketing efforts the plaintiff's mark [Toys "R" Us] has developed strong secondary meaning as a source of children's products"). An analysis of these factors reveals that the Miracle–Gro mark has established a secondary meaning through decades of exclusive use, extensive advertising, commercial success, and unsolicited media coverage.

The Miracle–Gro mark has been exclusively used by Stern's for over 41 years. Stern's states that a computerized trademark search reveals that no registration of the term "Miracle–Gro" exists in connection with any product or service other than Stern's usage. Declaration of Jeffrey A. Schwab, Esq., dated January 26, 1993, at ¶¶ 3–4. Over the years, Stern's has, in good faith, enforced its rights to the mark against known infringers. Declaration of Horace Hagedorn, dated January 26, 1993 ("Hagedorn Declaration"), at ¶ 11.

During this period, the registered Miracle–Gro trademark has been widely featured in advertising, promotional and informational materials. In the last twenty years, Stern's

---

**5.** Even though the Court finds that Miracle–Gro is a suggestive mark rather than merely descriptive, the Court would not characterize it as strongly suggestive. The critical legal distinction between a descriptive and suggestive mark is that a descriptive mark requires proof of secondary meaning to be entitled to trademark protection, while a suggestive mark is entitled to protection

without such proof of secondary meaning. *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 212–13 (2d Cir.1985); *McGregor–Doniger Inc.,* 599 F.2d at 1131. This distinction becomes less critical in the instant case because the Court, as noted *infra,* finds that plaintiff has established secondary meaning with respect to the Miracle–Gro mark.

has invested approximately one hundred million dollars in the United States promoting its product and the Miracle–Gro trademark. Kenlon Declaration, at ¶ 15. More specifically, in 1992 alone, approximately $14 million was spent for television, magazine, newspaper and other advertisements promoting Miracle–Gro brand plant food. Similarly, in 1991, over $12 million was spent on such advertisements. Kenlon Declaration, at ¶ 16; *see, e.g., McGregor–Doniger*, 599 F.2d at 1132 ("[p]roof of secondary meaning acquired perhaps through successful advertising, can only enhance the strength of [plaintiff's] mark and thus enlarge the scope of protections to which it is entitled").

Advertisements for Miracle–Gro plant foods have featured such well-known personalities as James Whitmore, Helen Hayes, Beverly Sills, Richard Dysart, and Tom Seaver. Moreover, in the past few years, Stern's also has been involved in various programs to serve the community, which have been publicized in the media. For instance, since 1991, Stern's has financially sponsored the education of 50 inner-city children in New York City as part of its "Miracle–Gro Kids" program. As part of the program, Stern's pays for the tuition and educational expenses of its Miracle–Gro kids for as long as each child continues his or her education. In addition, Stern's will be sponsoring over 500 children a year as part of its "Farm's for City Kids" program which brings city kids to a Vermont dairy farm. Hagedorn Declaration, at ¶¶ 12–13.

As a result of its forty-one years of effort, Stern's Miracle–Gro is now the largest selling brand of water soluble plant foods for lawn and garden use in the United States. Kenlon Declaration, at ¶ 12. Miracle–Gro plant food is nationally distributed and sold in more than 40,000 retail stores in the United States, including K–Mart, Walmart, Home Depot, and other major retailers. *Id.* at ¶ 18. Over twenty million containers of Miracle–Gro plant food, in various sizes, were sold in 1991. *Id.* at ¶ 12.

This commercial success has been accompanied by significant unsolicited media coverage, which the Court also finds relevant for purposes of determining the existence of secondary meaning. Many gardeners listed in the Guinness Book of World Records attribute their success to Miracle–Gro and the product has been referred to in numerous news accounts. Hagedorn Declaration, at ¶ 6. Moreover, other companies have used the Miracle–Gro product in advertisements to analogize the characteristics of the plant food to its own product. *Id.* at ¶ 14. For example, Lexus has an advertisement which analogizes the car's effect on the driver's ego to the effect of Miracle–Gro brand plant food on plants. Companies such as AT & T's UNIX System V and Barnett Banks also have used Miracle–Gro plant food in their advertisements to make similar analogies. In addition, Miracle–Gro plant food also has been the subject of political cartoons. *Id.* at ¶ 14, Exhibits 4–6.

Therefore, based upon evidence offered by Stern's, the Court finds that the registered trademark Miracle–Gro has come to enjoy widespread and favorable recognition among the public and trade and has acquired a secondary meaning as a source originating indicia.

As part of its reply papers, Stern's also submitted a consumer survey regarding Miracle–Gro plant food, conducted by R L Associates, a consumer survey research and marketing consulting firm. *See* Declaration of Michael Rappeport, dated January 22, 1993 ("Rappeport Declaration"). This survey was not conducted for this case, but rather it is a prior survey which R L Associates had developed and administered in connection with a trade dress and dilution case filed by Stern's approximately one year ago. Based upon this prior survey, Michael Rappeport, a founding principal of R L Associates, concluded that the Miracle–Gro trademark has acquired a high degree of secondary meaning. *Id.* at ¶ 25.

However, as the defendant correctly points out, the survey was tailored to the specific issues in the prior case. More specifically, the survey was limited to consumers who were involved in taking care of flower or vegetable gardens. In addition, the survey only involved Stern's format (*i.e.* colors and layout), and not the mark itself. The Court finds that the differing context of this survey

undermines the usefulness of the survey in this case and, thus, the Court affords no weight to the survey.

■ Defendant Shark suggests that the absence of a definitive consumer survey on this issue requires the Court to find that Stern's has not met its burden with respect to establishing secondary meaning. The Court finds this argument to be without merit. Stern's has presented sufficient other evidence—including the existence of an exclusive mark for over four decades, extensive advertising expenditures, commercial success, and widespread unsolicited media attention—to establish secondary meaning for preliminary injunction purposes, even in the absence of a definitive consumer survey. The Second Circuit has emphasized that it has not set forth "any requirement that survey evidence of secondary meaning or customer confusion be introduced before a plaintiff may obtain a preliminary injunction." *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 78 (2d Cir.1985); *see also Thompson Medical Co.*, 753 F.2d at 217 (to determine existence of secondary meaning, "every element need not be proved"); *Artemide SpA v. Grandlite Design and Manufacturing Co.*, 672 F.Supp. 698, 709 (S.D.N.Y.1987) ("[t]here is no requirement that survey evidence be presented at the preliminary injunction stage").

Based upon the current record in this case, the plaintiff has adduced strong evidence of secondary meaning as to the Miracle–Gro mark in the mind of the general public. This evidence, along with the conceptually distinct features of the mark, lead the Court to conclude that the Miracle–Gro mark is a strong mark and, thus, the first *Polaroid* factor weighs heavily in plaintiff's favor.

### (2) *The Similarity of the Marks*

Under this *Polaroid* factor, the Court considers the similarity of the marks in an effort to determine if such similarity is likely to provoke confusion among potential customers. *McGregor–Doniger Inc.*, 599 F.2d at 1133. Therefore, the Court must "look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember."

*W.W.W. Pharmaceutical Co.*, 984 F.2d at 573.

■ In the instant case, the marks used by Stern's and Shark are virtually identical. Stern's uses the phrase "Miracle Gro" as the name for its plant food product and the mark appears prominently on the product's label and advertisements. Similarly, two of Shark's hair care products are named "Miracle Gro" and that mark also appears prominently on the products' label. Thus, the marks are composed of the same words and sound the same when uttered. The fact that Stern's uses a hyphen in its mark, while Shark does not, is too minor a difference to be classified as significant by the Court. It is extremely unlikely that such a minor difference would be noticed by consumers and it is undetectable when the two marks are spoken. *See Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons*, 523 F.2d 1331, 1340 (2d Cir.1975); *Toys "R" Us, Inc.*, 559 F.Supp. at 1197. Similarly, the Court attaches no significance to the minor lettering and stylistic differences between the marks. Therefore, the virtually identical nature of the marks provides strong support for Stern's claim that consumer's will be confused as to the source or origin of Shark's hair products.

### (3) *Proximity of the Products*

Under this prong of the inquiry, the Court considers whether the two products are in competition with each other. It is well-settled that " '[t]o the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion.' " *W.W.W. Pharmaceutical Co.*, 984 F.2d at 573 (*quoting Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 582 (2d Cir.1991)).

■ There is an obvious dissimilarity between plant food and hair care products and this factor weighs heavily in Shark's favor. While the parties have this fundamental and significant distinction, there are some similarities in the characteristics and qualities of the products which could confuse the public as to whether there is a common source or affiliation between the products. Even though the products claim to promote

healthy growth in different contexts, consumers may believe that the chemicals or secret processes which have been successful with plants are now being used with respect to hair care products. Moreover, there are certain analogous mental images associated with the two products. Thus, Stern's has raised a significant question as to consumer confusion about whether there is a common origin or source to these products. *See McGregor–Doniger Inc.*, 599 F.2d at 1136 ("[b]ecause consumer confusion is the key, the assumptions of the typical consumer, whether or not they match reality must be taken into account"). As noted earlier by the Court, the Court finds that the Miracle–Gro mark has developed a strong secondary meaning through plaintiff's forty years of marketing its plant food. Accordingly, the secondary meaning of the Miracle–Gro mark, and the similar claims made by the two products (*i.e.* strong, healthy growth), contributes to the likelihood of confusion even though the products are used in entirely different contexts.

#### (4) *Bridging the Gap*

■ This factor addresses whether there is a likelihood that Stern's will enter the hair care products market. *See Centaur Communications, Ltd.*, 830 F.2d at 1227. Stern's has stated that it has no intention to enter the market for hair care products. Therefore, this factor weighs in Shark's favor.

#### (5) *Evidence of Actual Confusion*

■ Evidence of actual confusion is a strong indication that a likelihood of confusion exists. However, since actual confusion is difficult to prove, it is well-established that actual confusion need not be shown to prove likelihood of confusion under the Lanham Act. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 170–71 (2d Cir.1991); *Centaur Communications, Ltd.*, 830 F.2d at 1227; *Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 875. Plaintiff Stern's has not demonstrated any actual confusion that has resulted from defendant Shark's use of the Miracle Gro mark on its hair care products. As noted by the Second Circuit, "[i]t would be unfair to penalize [plaintiff] for acting to protect [its] trademark rights before serious damage has occurred." *Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 875. Thus, the lack of evidence of actual confusion does not substantially weaken Stern's position under the circumstances of this case.

#### (6) *Good Faith*

In assessing good faith, the Court must consider " 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.' " *W.W.W. Pharmaceutical Co.*, 984 F.2d at 575 (quoting *Lang*, 949 F.2d at 583). The Court finds that there is some evidence that Shark is utilizing the Miracle Gro mark to capitalize, either directly or indirectly, from the favorable image and goodwill that the term "Miracle Gro" has developed in the mind of the public due to Stern's efforts over the past four decades in developing their mark.

■ First, when a company appropriates an identical mark that is well-known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark, as well as any confusion that might result as to the common origin between that mark and the senior user's product. As was noted by the Court in *Toys R Us, Inc.*:

> On the assumption that a businessman will ordinarily act to his commercial advantage, and that the attraction of an established business' good will to the newcomer's product is such an advantage, the inference to be drawn from imitation is the imitator's own expectation of confusion as to the source of origin of his product. Where … there is little to distinguish the marks themselves and the prior mark is a long-established one of which the newcomer was aware, doubts about intent are resolved against the newcomer, and a reasonable explanation of its choice is essential to establish lack of intent to deceive.

*Toys "R" Us, Inc.*, 559 F.Supp. at 1199 (quoting *E.I. duPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502, 514 (E.D.N.Y. 1975) (citations omitted)); *Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.*, 281 F.2d 755, 759 (2d Cir.1960) ("the multiplicity of

similarities is objective evidence of defendant's conscious imitation of plaintiff's product").

Given the commercial strength of Miracle–Gro plant food, the Court can infer that Shark knew of the existence of the Miracle–Gro mark when adopting that mark for certain of its hair care products. In any event, plaintiff Stern's states that, on August 27, 1992, defendant's counsel was advised by Stern's that its use of the Miracle Gro mark was infringing upon Stern's rights and Stern's demanded a cessation of all infringing activity. Subsequent to correspondence and oral communications concerning an extra-judicial resolution of the matter, Shark's counsel orally assured Stern's counsel that Shark would discontinue its unauthorized use of the Miracle–Gro trademark, and that it would forward samples of new packaging. On December 14, 1992, Shark's counsel facsimiled a copy of Shark's revised packaging and the Miracle Gro mark had not been removed. Plaintiff's Memorandum in Support of Its Application for an Order to Show Cause and Preliminary Injunction, dated December 28, 1992, at 6; Declaration of Norman S. Beier, Esq., dated December 28, 1992, at ¶¶ 7–10.

Thus, the Court finds that the evidence clearly shows that defendant Shark continued to use the name with knowledge of plaintiff's objection to the use of the mark.[6] This continued use of the mark tends to indicate a measure of bad faith on defendant's part. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258–59 (2d Cir.1987); *Eastman Kodak Co. v. Rakow*, 739 F.Supp. 116, 119 (W.D.N.Y.1989). Accordingly, based on the strength of the mark and defendant's continued use of the mark after plaintiff objected to the use, the Court finds that there is some evidence of bad faith on the part of Shark in trying to capitalize on the positive image and secondary meaning that is associated with the Miracle–Gro mark.

Defendant Shark argues that it adopted the mark in good faith. To support this position, Shark notes that there are a number of active trademark applications and registrations for trademarks including either the term "Gro" or "Grow" for goods relating to hair such as "Wonder Gro," "Gro–Fine," "Grocomplex 5000," and others. Shark has developed a line of ethnic hair products under the trademarks of African Pride and African Miracle. Shark argues that it merely used the Miracle Gro mark on two of its hair conditioner products to compete with the various ethnic hair conditioners which use the term "Gro" to describe or suggest that their use promotes the growth of strong, healthy hair.

The Court finds this explanation unpersuasive for several reasons. First, Stern's does not claim that any use of the term "Gro" in a product name will lead to confusion; rather, it is solely the use of that term in conjunction with the adjective which Stern's is seeking to enjoin. In other words, as shown by the names of various hair care products such as those listed above, the number of ways Shark can incorporate "Gro" into the name of its product are incalculable. The fact that the Miracle–Gro mark is a strong mark that is commercially well-known undermines Shark's argument that it was not trying to capitalize on the goodwill and positive image of that mark by adopting it for certain products. Moreover, their continued use even after being notified by Stern's of the existence of a registered trademark of that term is additional evidence of bad faith. While such evidence is certainly not conclusive, the Court finds that this evidence of bad faith on the part of defendant provides some additional support for issuing a preliminary injunction on the Lanham Act claims.

#### (7) *Quality of Defendant's Product*

This factor assesses whether the junior user's product is of a low quality. Courts have noted that "[i]f an infringing product is of inferior quality, the senior user is entitled to protect 'the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user....'" *W.W.W. Pharmaceutical Co.*, 984 F.2d at 575 (quoting *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167,

---

**6.** The Court emphasizes that it does not consider these statements, made during the course of settlement discussions, as any type of admission by defendant Shark as to the merits of this action. Such considerations are clearly inappropriate. *See* Fed.R.Evid. 408.

1172 (2d Cir.1976)). Stern's admits that it is unfamiliar with the hair care product industry and offers no evidence as to the quality of Shark's products. However, Stern's does argue that, in Shark's advertisements, it makes unsupported representations concerning its product's ability to promote hair growth and, as a result, is a potential subject of a Federal Trade Commission investigation. Stern's contends that, under such circumstances, Shark's hair care products could be investigated or enjoined and that headlines would appear stating "Sales of Miracle Gro Enjoined" or "FTC Accuses Miracle Gro of False Advertising." Stern's argues that this type of negative publicity about the defendant's products could lead to consumer confusion and undermine the goodwill and positive secondary meaning which Stern's has developed as to its plant food product and the Miracle–Gro mark.

■■■ The Court finds this argument is completely unsupported. Stern's has presented no evidence as to the quality of Shark's hair care products. Moreover, there is no evidence that Shark's products are the subject of any regulatory investigation. While the Court recognizes that Stern's has a legitimate concern about confusion as to the source of the products in general, their argument concerning scandal and government investigation of defendant's products is purely speculative. Thus, the Court finds that this *Polaroid* factor is irrelevant to the Court's analysis in the instant case in the absence of credible evidence as to the quality of defendant's product.

### (8) *Sophistication of the Buyers*

■■■ This *Polaroid* factor examines the amount of care and attention which a consumer takes in evaluating a product before making a purchase. *Plus Products,* 722 F.2d at 1007; *McGregor–Doniger Inc.,* 599 F.2d at 1137. The Second Circuit has noted that "[t]he greater the value of an article the more careful the typical consumer can be expected to be...." *McGregor–Doniger Inc.,* 599 F.2d at 1137. Sophisticated consumers are less likely to be confused regarding a product's source. *See Plus Products,*

722 F.2d at 1007; *Centaur Communications, Ltd.,* 830 F.2d at 1228.

The products sold by both plaintiff and defendant are low-priced items, which are often sold in discount stores, such as K–Mart and Walmart. Consumers are likely to purchase these types of low-priced items without devoting much time and attention to making the decision. Thus, the purchase of either party's product is not a major expenditure for most consumers and the packaging is unlikely to be carefully scrutinized before making the purchase. Under such circumstances, the likelihood that consumers will assume that Shark's product originates with a source that has some connection or affiliation to Stern's is substantially increased.

### B. *Balancing the Factors*

■■■ The determination of likelihood of confusion is difficult in the instant case where each party has certain factors that weigh in their favor. However, the Court has carefully considered and weighed the various *Polaroid* factors and finds that there is sufficient evidence as to likelihood of confusion to warrant issuance of a preliminary injunction. While the *Polaroid* factors guide the Court's analysis, the likelihood of confusion issue is always one that is unique to each set of facts. *Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 253 (2d Cir.1982). The Court's decision in this case rests heavily on the strength of the plaintiff's mark and the secondary meaning that has developed in that mark over the past four decades, the virtually identical nature of the marks, and the lack of sophistication of the purchasers. The evidence, taken cumulatively, suggests that plaintiff will likely succeed on its claim that consumers are likely to be confused as to the source or affiliation of defendant's product due to the use of plaintiff's mark. While the inference of bad faith is also a factor in the Court's decision, the Court would reach the same conclusion as to the "confusion issue" even if a showing of good faith were made.

The defendant's primary argument is that plant food and hair care products are so different that likelihood of confusion is not possible. However, there are several forms

of confusion which are likely in this type of situation even though different products are involved. First, the virtual identical nature of the marks make it likely that consumers will think that there is some connection or association with the plaintiff's and defendant's products. This problem is intensified in an age were companies frequently cross product lines and enter markets which have little relation to their original product.

Second, even if consumers do not consciously assume that the defendant's product is somehow affiliated with plaintiff's product, there is the likelihood that consumers will be attracted to defendant's product on the strength of the goodwill and positive image established by plaintiff with respect to the Miracle–Gro mark. The trademark laws are designed to protect this type of subtle, associational confusion, even if it can be dispelled by the consumer upon further investigation of the defendant's product. *See Toys "R" Us, Inc.,* 559 F.Supp. at 1201 ("defendant's use of a name so similar in sound and association to that of the plaintiff's was an attempt to trade on the plaintiff's goodwill, and, as such, creates a likelihood of associational confusion").

Trademark laws are designed to protect the goodwill and reputation of marks by preventing the use of such marks in competing markets, as well as noncompeting markets, where consumer confusion will result. The Court, applying the *Polaroid* factors to the unique facts of this case, finds that a likelihood of confusion as to the source or affiliation of defendant's product exists due to the use of the identical mark, albeit in differing markets. Accordingly, plaintiff has established a likelihood of success on the merits with respect to the causes of action for trademark infringement, pursuant to 15 U.S.C. § 1114(1), and false designation of origin, pursuant to 15 U.S.C. § 1125(a), and a preliminary injunction on these grounds is warranted.

## II. DILUTION OF TRADEMARK

■ The plaintiff also asserts a cause of action pursuant to Section 368–d of the New York General Business Law. This antidilution statute provides as follows:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

New York Gen.Bus.Law § 368–d. As stated in the brief legislative history accompanying Section 368–d, the purpose of this statute is to prevent "the whittling away of an established trade-mark's selling power and value through its unauthorized use by others upon dissimilar products." 1954 N.Y.Legis.Ann. 49. The mark need not be "famous" or "celebrated," but it must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning. *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1032–33 (2d Cir.1989) (Sweet, J., concurring); *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983); *Toys "R" Us, Inc.,* 559 F.Supp. at 1206.

It is well-established that to prevail on a claim under this section, a plaintiff must establish two elements. "First plaintiff's mark must possess a distinctive quality capable of dilution." *Mead Data Central, Inc.,* 875 F.2d at 1030 (*citing Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977)). "Second, plaintiff must show a likelihood of dilution." *Mead Data Central, Inc.,* 875 F.2d at 1030 (*citing Sally Gee, Inc.,* 699 F.2d 621, 625 (2d Cir.1983)). The Second Circuit has emphasized that "[a]s section 368–d expressly states, a plaintiff need not show either competition between its product or service and that of the defendant or a likelihood of confusion as to the source of the goods or services." *Mead Data Central, Inc.,* 875 F.2d at 1030.

### A. *Distinctiveness of the Mark*

■ The Second Circuit has noted that "[d]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." *Mead*

*Data Central, Inc.*, 875 F.2d at 1030. Thus, the Court's earlier analysis of the strength of the Miracle–Gro mark in the infringement context applies with equal force in the dilution context. As noted earlier, a mark's strength is measured by its inherent distinctiveness, as well as its distinctiveness in the marketplace. Miracle–Gro is a suggestive mark that is conceptually distinct due to the unique combination of terms, along with the misspelling of "Grow."

Distinctiveness has also been defined as a mark which has acquired a secondary meaning. *Mead Data Central, Inc.*, 875 F.2d at 1030. As stated earlier, the Court has determined that the Miracle–Gro mark has developed a secondary meaning in the mind of the consumer public based upon the duration and exclusivity of the mark, the extensive advertising expenditures on a national level, the significant unsolicited media coverage, and the overall commercial success of the product.

Accordingly, the Court finds that the Miracle–Gro mark has a distinctive quality capable of dilution based upon the conceptual strength of the mark, as well as the secondary meaning which the mark has acquired in the mind of the public.

#### B. *Likelihood of Dilution*

The second element that plaintiff must satisfy under Section 368–d is the likelihood of dilution. The Second Circuit has "defined dilution as either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Mead Data Central, Inc.*, 875 F.2d at 1031; *see also Sally Gee, Inc.*, 699 F.2d at 625.

 With respect to tarnishing of the mark, the strength of the Miracle–Gro mark and the defendant's use of the identical name for its product create the likelihood that consumers will make some type of mental association between the two products and their marks. Stern's argues that this mental association could lead to a tarnishing of the Miracle–Gro mark if the defendant's hair care products do not effectively facilitate a consumer's hair growth, as advertised. However-

er, as noted earlier, plaintiff has offered no evidence as to the quality of defendant's products. Therefore, the Court finds there is insufficient evidence to find tarnishing of the Miracle–Gro mark by defendant's product for purposes of a preliminary injunction motion.

 However, the Court does find that plaintiff has demonstrated a likelihood of blurring of the Miracle–Gro mark's product identification. There is certainly the likelihood that use of the identical mark by the defendant in promoting its hair care products will dilute the associational quality and image provoking nature of the Miracle–Gro mark. *See Sally Gee, Inc.*, 699 F.2d at 624–25 ("[t]he interest protected by § 368–d is not simply commercial goodwill, but the selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public"); *Toys "R" Us, Inc.*, 559 F.Supp. at 1208 ("[T]he identity of the 'R' Us suffixes and the similarity of the children's products sold by the stores compels me to conclude that the name Kids 'R' Us is likely to blur Toys "R" Us' product identification. Clearly, the distinctiveness of plaintiff's mark is being 'whittled away' by a proliferation of 'R' Us names, including Kids 'r' Us, and the mark's accompanying selling power is being diluted.")

Plaintiff argues that there is no likelihood of dilution in this case because of the dissimilar nature of the products. However, this argument seems to misconstrue the purpose of anti-dilution provisions. As noted earlier, the legislative history clearly states that the purpose of Section 368–d is to prevent "the whittling away of an established trademark's selling power and value through its unauthorized use by others upon *dissimilar products.*" 1954 N.Y.Legis.Ann. 49 (emphasis added). Moreover, the legislative history also refers to hypothetical examples of dilution that can result from a dissimilar product such as "DuPont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." 1954 N.Y.Legis.Ann. 49–50.

The New York Court of Appeals has emphasized that the fact that parties are not in

direct competition does not undermine a cause of action under Section 368–d:

> The evil which the Legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trade-mark or name.

*Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165–66 (1977).

Similarly, the Second Circuit, applying New York law, has repeatedly held that where a plaintiff has developed a distinctive mark, there can be a likelihood of dilution even though the products at issue are dissimilar and there is no showing of likelihood of confusion as to the source of the goods. *See Mead Data Central, Inc.,* 875 F.2d at 1030; *Sally Gee, Inc.,* 699 F.2d at 624.

Accordingly, the fact that, in the instant case, Shark sells hair care products while Stern's sells plant food does not undermine plaintiff's cause of action for dilution of the mark. Stern's has expended substantial time and money encouraging the public's awareness of its trademark. Moreover, the evidence demonstrates that, as a result of these efforts, the mark has come to enjoy widespread and favorable recognition among the public. Stern's need not show confusion to establish likelihood of success as to its cause of action under Section 368–d. Even if there is a segment of the public who will not be confused and will recognize that defendant's product would not likely have an affiliation with Stern's, defendant's appropriation of the identical mark could dilute and eventually dispel the distinctive quality of Stern's unique mark, thereby destroying Stern's goodwill and reputation which accompanies its mark. This is precisely the type of dilution that the New York State legislature sought to prevent by enacting the anti-dilution statute. *See, e.g., Eastman Kodak Co. v. Rakow,* 739 F.Supp. 116, 119–20 (W.D.N.Y. 1989) (comedian permanently enjoined under Section 368–d from using the stage name "Kodak" because such use would dilute trademark in that name).

### C. *Predatory Intent*

 Finally, the Court will address the issue of predatory intent in the dilution context. *Sally Gee, Inc.,* 699 F.2d at 626.[7] As noted in the Court's discussion of the Lanham Act claims, there is evidence to suggest that Shark was not acting in good faith in adopting the mark and continuing to use that mark. First, Shark adopted, almost verbatim, the Miracle–Gro mark which is widely recognized and has acquired a secondary meaning within the marketplace. Moreover, Shark has continued to use that mark even after Stern's contacted defendant's counsel and objected to the use. While this type of evidence does not, by any means, establish conclusive evidence of predatory intent, the Court, after examining the entire record, finds that Stern's has raised serious questions about Shark's predatory intent in adopting the mark and its continued use of that mark in the wake of Stern's objections.

In sum, the Court finds that Stern's has demonstrated likelihood of success on the merits in arguing that defendant's continued use of the Miracle Gro mark in selling hair care products will dilute the mark. Therefore, Stern's is entitled to a preliminary injunction based upon the cause of action for dilution under Section 368–d.

### III. COMMON LAW UNFAIR COMPETITION

Aside from the statutory provisions discussed, plaintiff also has brought a common law cause of action for unfair competition. It is well-established that New York law recog-

---

7. There is some ambiguity in the Second Circuit decisions as to whether "predatory intent" is a requisite element or merely a relevant, but not conclusive, factor. *Compare Sally Gee, Inc.,* 699 F.2d at 626 (absence of predatory intent is a "relevant factor") and *Mead Data Central, Inc.,* 875 F.2d at 1037 (Sweet, J., concurring) (predatory intent is a factor, but "not an independent element"), *with W.W.W. Pharmaceutical Co.,* at 576–77 (suggesting that predatory intent is an "element" of the cause of action under Section 368–d). This issue is irrelevant in this case because the Court has found that there is sufficient evidence of predatory intent for purposes of establishing likelihood of success on the merits.

nizes an unfair competition cause of action for "palming off" goods as those of another. *See Shaw v. Time–Life Records,* 38 N.Y.2d 201, 206–07, 379 N.Y.S.2d 390, 395–96, 341 N.E.2d 817, 820–21 (1975). "[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders, A Division of Harcourt Brace Jovanovich, Inc.,* 728 F.Supp. 236, 249–50 (S.D.N.Y.), *aff'd,* 923 F.2d 845 (2d Cir.1990) (quoting *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.,* 678 F.Supp. 424, 429 (S.D.N.Y.1987)); *see also Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980).

■ Plaintiff Stern's contends that Shark's use of the Miracle Gro mark falsely implies that there is a connection between plaintiff's and defendant's products and, thus, argues that an unfair competition claim exists under New York law. To succeed under an unfair competition claim, a plaintiff must demonstrate the likelihood of confusion. Additionally, there must be some element or showing of bad faith. *See Saratoga Vichy Spring Co.,* 625 F.2d at 1044. The Court notes that, unlike the federal law claims, proof of secondary meaning need not be shown. *See Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139 (2d Cir.1992); *Morex S.p.A. v. Design Inst. of America, Inc.,* 779 F.2d 799, 801 (2d Cir.1985); *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 618 F.2d 950, 952–53 (2d Cir.1980), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

■ In the instant case, the Court has already found, in the context of the Lanham Act claims, that plaintiff has demonstrated the likelihood of confusion among the purchasing public as to the origin or affiliation of the defendant's product. Moreover, based upon the virtual identical copying of a well-known mark and the continued use of that mark after plaintiff conveyed its concerns to defendant, the Court also has found an element of "bad faith" on the part of Shark. While this preliminary showing of bad faith is not conclusive, it is sufficient for purposes

of establishing a likelihood of success as to the unfair competition claim.

Accordingly, plaintiff has shown a likelihood of success on the merits as to the claim of unfair competition and, therefore, established a fourth independent ground for the issuance of a preliminary injunction.

## IV. SERIOUS QUESTIONS GOING TO THE MERITS AND BALANCING OF HARDSHIPS

■ Even assuming *arguendo* that plaintiff had not demonstrated likelihood of success on the merits, the evidence presented by plaintiff, at the very least, would be sufficient to raise serious questions going to the merits of these four claims and the Court finds that a balance of hardships tips decidedly in the movant's favor.

In balancing the equities in trademark cases, courts have noted that "a powerful equitable argument against finding infringement is created when the junior user, through concurrent use of an identical trademark, develops goodwill in the mark." *Lambda Electronics Corp. v. Lamda Technology, Inc.,* 515 F.Supp. 915, 929 (S.D.N.Y. 1981) (citing *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 49 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)); *Toys "R" Us, Inc.,* 559 F.Supp. at 1199–1200.

In the instant case, Shark was incorporated in April, 1991 for the purpose of developing, manufacturing and marketing a new line of ethnic hair care products. Shark did not begin selling hair care products until September 1991. In September 1991, Shark began selling four hair care products under the "African Pride" line, including the two products which bear the Miracle Gro mark. Shark has since added three other hair care products to its "African Pride" line, which do not contain the Miracle Gro mark. Therefore, Shark has been selling the hair care products using the Miracle Gro mark for only 18 months. Defendant Shark has presented no evidence that it established any goodwill in this mark during this very short time frame.

Moreover, any hardship is further diminished by the fact that Shark has been promoting its products under the African Pride line since September 1991 and, more recently, has used African Miracle on its hair care products. Shark applied for trademark registration for the "African Pride" and "African Miracle" marks in September 1992 and both marks recently have been approved. Therefore, even if Shark were enjoined from using the Miracle Gro mark on two of its products, Shark could continue to market these products under the African Pride and African Miracle marks, and could use the term "gro" as long as it was not used in combination with the work "miracle." Moreover, Stern's has no objections to the packaging of the product, but rather simply objects to the use of the term "Miracle Gro." Under these circumstances, the loss of any existing goodwill for these two products resulting from alteration of the mark would be minimal. In addition, the Court notes that only two of Shark's seven hair care products bear the Miracle Gro mark. The other five products would be completely unaffected by an injunction in this case.

In contrast, Stern's has spent over four decades and approximately $100 million dollars establishing the goodwill of the Miracle–Gro mark in promoting its plant food product. Stern's has focused its advertising and packaging on creating consumer recognition of the Miracle–Gro mark and establishing a secondary meaning of the mark in the mind of the public. In many ways, the commercial success of the product and company hinges on maintaining the distinctiveness of the Miracle–Gro mark in the mind of the public. Any dilution of that mark, or confusion in the mind of the public as to the origin of other products bearing that mark, could have a negative impact on the commercial success of the product.

Accordingly, despite the relatively small size of the defendant's company, the balance of hardships decidedly favors the plaintiff under the circumstances of this case. This factor, combined with the serious questions going to the merits of the various claims, establish sufficient grounds for issuing an injunction even in the absence of a likelihood of success on the merits as to the plaintiff's four causes of action.

## V. IRREPARABLE HARM

The showing of irreparable harm by the moving party must be more than the mere "possibility" of irreparable harm. Instead, the moving party must demonstrate "that it is *likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). The existence of a likelihood of confusion in a trademark case is strong evidence of irreparable harm because damage to reputation is difficult to prove or quantify. *See Church of Scientology Int'l v. Elmira Mission of Church of Scientology*, 794 F.2d 38, 41 (2d Cir.1986); *LeSportsac, Inc.*, 754 F.2d at 79. Moreover, the injury resulting from trademark dilution, or unfair competition, is similar to a Lanham Act injury in that it is extremely unlikely that the moving party can be fully recompensed by money damages.

The Court finds that Stern's has made a clear showing that it will suffer irreparable injury if defendant Shark is permitted to continue the distribution of hair care products under the Miracle Gro mark. For over forty years, Stern's has made a concerted effort to associate the Miracle–Gro trademark with a single, reliable source of high-quality, effective water soluble plant food. As a result of the remarkable success of this campaign, the goodwill and reputation that Stern's has acquired is inextricably linked to the Miracle–Gro mark. The Miracle–Gro mark has a secondary meaning in the mind of the general public. This image and identity is a critical element of the trademark's value.

Based upon the showing of likelihood of confusion, the Court finds that the use of that mark by Shark will result in irreparable harm to the goodwill and reputation that Stern's has cultivated with respect to the Miracle–Gro mark. Moreover, even in the absence of likelihood of confusion, the dilution of the Miracle–Gro mark also will result in irreparable harm. In this type of case, the loss of goodwill and reputation due to defendant's activities simply cannot be com-

pensated adequately by an award of money damages. *See National Lampoon, Inc. v. American Broadcasting Co., Inc.,* 376 F.Supp. 733 (S.D.N.Y.), *aff'd,* 497 F.2d 1343 (2d Cir.1974).

## VI. FORM AND SCOPE OF THE PRELIMINARY INJUNCTION

Having considered the submitted materials and the arguments of counsel at the January 19, 1993 hearing, the Court finds that the issuance of a preliminary injunction is warranted. Pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, the Court must set forth the scope of the preliminary injunction. In accordance with Rule 65(d), the following constitutes the form and scope of the preliminary injunction:

It is hereby Ordered that pursuant to Federal Rule of Civil Procedure 65 the defendant Shark Products, Inc., its officers, directors, principals, agents, servants, employees, suppliers, successors and assigns, and all those in active concert and participation with it is enjoined and restrained, *pendente lite,* from:

(1) imitating, copying or making unauthorized use of the trademark Miracle–Gro;

(2) manufacturing, having manufactured, producing, having produced, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any product bearing any simulation, reproduction, copy or colorable imitation of the trademark Miracle–Gro;

(3) using any simulation, reproduction, copy or colorable imitation of the trademark Miracle–Gro, or any marks, appearance or means of identification confusingly similar thereto in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any product;

(4) making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any product manufactured, distributed or sold by the defendant is in any manner associated or connected with the plaintiff, or is sold, manufactured, licensed, sponsored, approved or authorized by the plaintiff; and

(5) engaging in any other activity constituting unfair competition with the plaintiff, or constituting infringement of the trademark Miracle–Gro, or any of plaintiff's rights in, or to use or to exploit said trademark, or constituting any dilution of the goodwill, name or reputation of the plaintiff.

## VII. SECURITY

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the Court must determine the amount of security that the applicant must post. The amount should reflect "the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). Under the circumstances of the instant case, the Court orders that plaintiff post bond in the amount of $25,000 by February 18, 1993.

## CONCLUSION

For the reasons set forth above, plaintiff has demonstrated irreparable harm and likelihood of success on the merits as to its claims for trademark infringement, false designation of origin, dilution, and unfair competition. The Court has issued a preliminary injunction in the terms specified above. All parties to this action shall appear before the Court for a pretrial status conference on Friday, March 26, 1993, at 3:00 p.m., in Courtroom 318.

**SO ORDERED.**

## ORDER ENJOINING DEFENDANT PENDENTE LITE

This matter is before the Court on the motion of the plaintiff Stern's Miracle–Gro Products, Inc. for a preliminary injunction, and having considered the submitted materials and the arguments of counsel at the January 19, 1993, hearing, the Court hereby ORDERS that the motion is GRANTED.

It is hereby **ORDERED** that pursuant to Federal Rule of Civil Procedure 65 the defendant Shark Products, Inc., its officers,

directors, principals, agents, servants, employees, suppliers, successors and assigns, and all those in active concert and participation with it is enjoined and restrained, *pendente lite,* from:

1. imitating, copying or making unauthorized use of the trademark "Miracle-Gro®;

2. manufacturing, having manufactured, producing, having produced, distributing, circulating, selling, offering for sale, advertising, promoting or displaying any product bearing any simulation, reproduction, copy or colorable imitation of the trademark Miracle-Gro®;

3. using any simulation, reproduction, copy or colorable imitation of the trademark Miracle-Gro®, or any marks, appearance or means of identification confusingly similar thereto in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any product;

4. making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any product manufactured, distributed or sold by the defendant is in any manner associated or connected with the plaintiff, or is sold, manufactured, licensed, sponsored, approved or authorized by the plaintiff; and

5. engaging in any other activity constituting unfair competition with the plaintiff, or constituting infringement of the trademark Miracle-Gro®, or any of plaintiff's rights in, or to use or to exploit said trademark, or constituting any dilution of the good will, name or reputation of the plaintiff; and it is further

**ORDERED** that plaintiff shall post a bond or cash in the amount of $25,000, by February 18, 1993.

IT IS SO ORDERED.